Bridget Psarianos (AK Bar No. 1705025)
Suzanne Bostrom (AK Bar No. 1011068)
TRUSTEES FOR ALASKA
121 W. Fireweed Lane, Suite 105
Anchorage, AK 99503
Phone: (907) 276-4244
Fax: (907) 276-7110
bpsarianos@trustees.org
sbostrom@trustees.org

*Attorneys for Plaintiffs*

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| NORTHERN ALASKA ENVIRONMENTAL CENTER, ALASKA COMMUNITY ACTION ON TOXICS, ALASKA WILDLIFE ALLIANCE, ALASKA WILDERNESS LEAGUE, EARTHWORKS, CENTER FOR BIOLOGICAL DIVERSITY, NATIONAL PARKS CONSERVATION ASSOCIATION, THE WILDERNESS SOCIETY, SIERRA CLUB, and WINTER WILDLANDS ALLIANCE, | Case No. 3:26-cv-00108 |
| Plaintiffs, | |
| v. | |
| DOUGLAS BURGUM, in his official capacity as Secretary of the U.S. Department of the Interior, U.S. DEPARTMENT OF THE INTERIOR, U.S. BUREAU OF LAND MANAGEMENT, KEVIN PENDERGAST, in his official capacity as the Alaska State | |

Director for the Bureau of Land Management,
and STATE OF ALASKA,

                                        Defendants.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**
(Alaska Native Claims Settlement Act 43 U.S.C. §§ 1601–1624; National Environmental
Policy Act, 42 U.S.C. §§ 4321–4347; Alaska National Interest Lands Conservation Act,
16 U.S.C. §§ 3101–3233; Federal Land Policy and Management Act of 1976, 43 U.S.C.
§§ 1701–1787; Administrative Procedure Act, 5 U.S.C. §§ 702–706)

Plaintiffs Northern Alaska Environmental Center, Alaska Community Action on

Toxics, Alaska Wildlife Alliance, Alaska Wilderness League, Earthworks, Center for

Biological Diversity, National Parks Conservation Association, The Wilderness Society,

Sierra Club, and Winter Wildlands Alliance (collectively, Plaintiffs) file this Complaint

for Declaratory and Injunctive Relief, alleging:

## I.      NATURE OF THE CASE

1.      This action seeks declaratory and injunctive relief against the Secretary of the

Interior (Secretary), U.S. Department of the Interior (Interior), the U.S. Bureau of Land

Management (BLM), and relevant agency officials (collectively, Defendants) to vacate

and set aside Defendants' actions and decisions revoking Public Land Orders (PLOs)

5150 and 5180 via PLO 7966. Those actions include Defendants' failure to comply with

the Alaska Native Claims Settlement Act (ANCSA), Alaska National Interest Lands

Conservation Act (ANILCA), the Federal Land Policy and Management Act of 1976

(FLPMA) and the National Environmental Policy Act (NEPA), as well as BLM's

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*N. Alaska Envt'l Ctr. v. Burgum*
Case No. 3:26-cv-00108                                    Page 2 of 50

ongoing process to transfer the lands subject to PLOs 5150 and 5180 to the State of Alaska (State).

2. The southern Brooks Range and Dalton Highway corridor are iconic areas of northern Alaska. The region and its pristine rivers provide habitat for numerous fish and wildlife species, including fish, caribou, birds, and moose. The area offers exceptional recreational experiences, in large part because of its incredible scenic and wildlife values, and it is home to several communities.

3. PLOs 5150 and 5180, issued in 1971 and 1972, respectively, withdrew lands along what is now the Dalton Highway and Trans-Alaska Pipeline System (TAPS) Corridor from mineral entry and selection by the State and other entities. These public lands have been under BLM's jurisdiction for decades and, as a result, they are subject to federal subsistence protections under ANILCA.

4. In lifting the PLOs and working toward transferring the lands to the State, Defendants failed to comply with federal statutes governing withdrawal revocations and prohibiting the State's topfilings from becoming effective selections in the areas withdrawn by PLOs 5150 and 5180. BLM also failed to comply with other federal statutes and regulations that impose important protections for the lands, wildlife, communities, and aquatic resources of the region. These laws require public participation and thorough, transparent, and careful analysis of the significant impacts of the agencies'

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*N. Alaska Envt'l Ctr. v. Burgum*
Case No. 3:26-cv-00108                                                      Page 3 of 50

Case 3:26-cv-00108-ACP     Document 1     Filed 03/10/26     Page 3 of 50

decisions and mandate that the agencies protect public resources and values within the project area.

5.     Defendants' authorizations and actions to revoke PLOs 5150 and 5180 and treatment of the State's topfiled lands as effective selections are "arbitrary, capricious, an abuse of discretion, . . . not in accordance with the law, . . . in excess of statutory authority," and "without observance of procedure required by law." 5 U.S.C. § 706(2).

## II. JURISDICTION AND VENUE

6.     This Court has jurisdiction over the parties and subject matter of this action under 28 U.S.C. §§ 1331 (federal question), 1361 (action to compel mandatory duty), 2201 (declaratory relief), and 2202 (injunctive relief).

7.     PLO 7966 revoking PLOs 5150 and 5180, the Secretary's Decision Rationale, and BLM's Determination of NEPA Adequacy (DNA) are final agency actions for which Plaintiffs have a right to judicial review under the APA. 5 U.S.C. §§ 702, 704.

8.     Defendants' sovereign immunity is waived pursuant to the APA. 5 U.S.C. § 702.

9.     Venue is proper in the District of Alaska under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred within the BLM Alaska State and Fairbanks District offices; because many Plaintiff groups are primarily located in or maintain offices in Alaska; and because the public lands at issue in the case are in Alaska.

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*N. Alaska Envt'l Ctr. v. Burgum*
Case No. 3:26-cv-00108                                                                 Page 4 of 50

Case 3:26-cv-00108-ACP     Document 1     Filed 03/10/26     Page 4 of 50

### III.   PARTIES

<u>Plaintiffs</u>

10.   Plaintiff Northern Alaska Environmental Center (Northern Center) is an Alaska nonprofit environmental organization founded in 1971 with 418 members, approximately sixty percent of whom are located in Alaska. The Northern Center's mission is to promote the conservation of the environment and sustainable resource stewardship in Interior and Arctic Alaska through education and advocacy, with the goal of ensuring that Alaska's globally significant wildlands remain healthy, biologically diverse, and productive for present and future generations. One of the Northern Center's core program areas is its clean water and mining program, through which it works to protect Arctic ecosystems, local communities, and vital wildlife habitat and wildlands — including the southern Brooks Range — from the environmental, cultural, and subsistence harms associated with mining and related infrastructure development, such as the Ambler Mining District Industrial Access Road (Ambler Road). Consistent with its mission, the Northern Center seeks to safeguard fish and wildlife resources that support subsistence traditions and a sustainable quality of life for Alaskans, and to amplify the voices of local and rural communities most directly impacted by public lands management decisions and industrial development. The Northern Center regularly participates in agency decision-making and public processes, and it provides its members

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*N. Alaska Envt'l Ctr. v. Burgum*
Case No. 3:26-cv-00108                                    Page 5 of 50

and the public with information about the environmental, cultural, and subsistence impacts of mining and road development, enabling informed public participation.

11.    Plaintiff Alaska Community Action on Toxics (ACAT) is an Alaska nonprofit public interest environmental health, research, and advocacy organization dedicated to protecting environmental health and achieving environmental justice. ACAT was founded in 1997 in response to requests from individuals, Tribes, and other communities seeking technical assistance because of concerns related to toxic contaminants. ACAT's mission is to assure justice by advocating for environmental and community health because everyone has the right to clean air, clean water, and toxic-free food. The organization works collaboratively with communities to facilitate environmental justice by holding corporations, the military, and governments accountable for their environmental practices. ACAT also helps communities put in place effective strategies to limit their exposure to toxic substances and to protect and restore the ecosystems that sustain them and their way of life. ACAT has tracked and actively participated for many years in decision-making processes relating to Arctic Alaska and the southern Brooks Range.

12.    Plaintiff Alaska Wilderness League (AWL) is a nonprofit organization founded in 1993, with offices in Washington, D.C. and Alaska. The mission of the organization is to protect Alaska's wild lands and waters by inspiring broad support for federal policy action, so that Alaska's wild landscapes endure to support vibrant

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*N. Alaska Envt'l Ctr. v. Burgum*
Case No. 3:26-cv-00108                                               Page 6 of 50

Case 3:26-cv-00108-ACP    Document 1    Filed 03/10/26    Page 6 of 50

communities and abundant wildlife. In addition to its focus on Alaska's Arctic — which includes the southern Brooks Range, as well as the National Petroleum Reserve–Alaska and Arctic National Wildlife Refuge (Arctic Refuge) — the organization has a long history working on issues affecting Southeast Alaska, and it has worked to secure protections for the Arctic Ocean, Chugach National Forest, and public lands statewide over the decades. AWL is committed to ensuring protections for public lands across Alaska, while honoring the human rights and traditional values of Alaska's Indigenous communities and subsistence users. The organization has 130,000 active members and supporters nationwide that it mobilizes to achieve changes in federal policy.

13.     Plaintiff Alaska Wildlife Alliance (AWA) was founded by Alaskans in 1978 to protect intact ecosystems so that our state's wildlife can be managed for biodiversity and the benefit of present and future generations. AWA has over 1,200 members and supporters. AWA and its members speak out against public lands management decisions and development that unduly threatens vulnerable Alaskan ecosystems and species. AWA is particularly concerned about impacts on the ecosystems and wildlife of the southern Brooks Range, including the Western Arctic Caribou Herd. AWA views the southern Brooks Range as one of the last unspoiled wild areas in the world, and it seeks to ensure that it is conserved for future generations of Alaskans and wildlife.

14.     Plaintiff Center for Biological Diversity (Center) is a nonprofit organization with over 101,000 members across the United States and beyond, including 400 members

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*N. Alaska Envt'l Ctr. v. Burgum*
Case No. 3:26-cv-00108                                                              Page 7 of 50

Case 3:26-cv-00108-ACP     Document 1     Filed 03/10/26     Page 7 of 50

in Alaska. The Center works through science, environmental law, and creative media to advocate for the protection and recovery of endangered, threatened, and rare species and their habitats throughout the United States, including Alaska. The Center has a long-standing interest in the conservation of threatened and endangered species and their habitats in Alaska. The Center also seeks to safeguard species and habitats from climate change by advocating for reducing greenhouse gas emissions and air pollution. The Center has advocated for protection of the wildlife that occur in the area previously withdrawn by PLOs 5150 and 5180 and for avoiding emissions associated with road traffic and development of the Ambler Mining District as well as the Alaska Liquified Natural Gas (LNG) Pipeline.

15. Plaintiff Earthworks is a nonprofit organization dedicated to protecting communities and the environment from the adverse impacts of mineral and energy development while promoting sustainable solutions. Earthworks fulfills its mission by working with communities and grassroots groups to reform government policies, improve corporate practices, influence investment decisions, and encourage responsible materials sourcing and consumption. Earthworks partners with local affected communities and national and international advocates to respond to and solve the growing threats to the earth's natural resources, clean water, biodiversity, special places, and communities from irresponsible mining and mining-related infrastructure.

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*N. Alaska Envt'l Ctr. v. Burgum*
Case No. 3:26-cv-00108                                    Page 8 of 50

16.    Plaintiff National Parks Conservation Association (NPCA) is a non-partisan, nonprofit organization that works to conserve and enhance America's national parks, monuments, and other public lands for current and future generations. Founded in 1919, NPCA is the only membership organization in the United States focused solely on the protection of the National Park System. Headquartered in Washington, D.C., NPCA has offices nationally, including in Alaska. NPCA has more than 1.9 million members and supporters, including those living in Alaska, and its members use, enjoy, and work to conserve our National Park System, including Gates of the Arctic National Park and Preserve (Gates of the Arctic). NPCA and its members are actively engaged in protecting the viewsheds, soundscapes, airsheds, watersheds, and other values that make Gates of the Arctic unique and worthy of protection. NPCA plays a crucial role in ensuring America's National Park System is protected in perpetuity by undertaking a variety of efforts, including educating decisionmakers and the public about preserving these landscapes, lobbying members of Congress to uphold legal protections for national parks and other protected lands, and assessing the health of national parks and monuments and advocating for their effective management.

17.    Plaintiff Sierra Club is a national nonprofit organization of approximately 621,400 members dedicated to exploring, enjoying, and protecting the wild places of Earth; to practicing and promoting the responsible use of the Earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*N. Alaska Envt'l Ctr. v. Burgum*
Case No. 3:26-cv-00108                                                    Page 9 of 50

Case 3:26-cv-00108-ACP    Document 1    Filed 03/10/26    Page 9 of 50

natural and human environment; and to using all lawful means to carry out these objectives. The Alaska Chapter of the Sierra Club has approximately 1,280 members. The Sierra Club's concerns encompass a variety of environmental issues in Alaska, and the organization has long been active on issues related to the protection of Arctic Alaska, including projects like the Ambler Road and the Alaska LNG Pipeline.

18.   Plaintiff The Wilderness Society is a nonprofit organization headquartered in Washington, D.C., with offices throughout the country, including a five-person staff in Alaska. Its overall mission is uniting people to protect America's wild places. The Wilderness Society has over a million members, supporters, and followers, a portion of which are in Alaska. The goal of its Alaska program is to permanently protect special places in America's Arctic and sub-Arctic, including in the southern Brooks Range. The Wilderness Society has been engaged in Arctic conservation efforts since its inception in the 1930s and has consistently participated in public processes associated with the Ambler Road. Among other areas of focus, staff from The Wilderness Society work to advance scientific understanding and conservation policy for highly migratory caribou that utilize much of the landscape in the southern Brooks Range to complete their life cycles.

19.   Plaintiff Winter Wildlands Alliance (Winter Wildlands) is a national non-profit organization dedicated to promoting and preserving winter wildlands and a quality human-powered snowsports experience on public lands nationwide. It has over 40,000

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*N. Alaska Envt'l Ctr. v. Burgum*
Case No. 3:26-cv-00108                                                    Page 10 of 50

Case 3:26-cv-00108-ACP     Document 1     Filed 03/10/26     Page 10 of 50

members and supporters and twenty-one affiliated organizations, which collectively have thousands of additional members, including many members who live and recreate in Alaska, including in the area that will be impacted by the withdrawal revocations. Winter Wildlands is engaged in promoting conservation and preserving opportunities for quiet winter recreation in the southern Brooks Range through agency proceedings and public education, and it has participated in decision-making processes related to the Ambler Road.

20.     Plaintiffs and their members and supporters live, work, visit, hunt, fish, and recreate in and around the southern Brooks Range and along the Dalton Highway corridor, including those lands and waters that will be impacted by the revocation of PLOs 5150 and 5180 and the impending conveyance of affected federal lands to the State. Plaintiffs and their members and supporters use the area that will be impacted by the revocation and land transfer for subsistence, recreational, aesthetic, scientific, health, spiritual, cultural, educational, business, photography, wildlife viewing, and other purposes. They also use and enjoy the fish and wildlife that depend on the region, including migratory birds and terrestrial mammals. Plaintiffs and their members and supporters have visited or live in the area, engage in hunting or fishing practices that depend on the health of wildlife and fish in the region, enjoy viewing its wildlife, and experience the wilderness values and habitat that the region provides. They use the area during multiple seasons because of its exceptional wilderness values and the peace and

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*N. Alaska Envt'l Ctr. v. Burgum*
Case No. 3:26-cv-00108                                                            Page 11 of 50

Case 3:26-cv-00108-ACP     Document 1     Filed 03/10/26     Page 11 of 50

quiet of this remote area. Plaintiffs' members and supporters live in or plan to return to this area and will continue to use and enjoy this area in the future.

21.     Plaintiffs and their members and supporters are harmed by revocation of PLOs 5150 and 5180 and the impending conveyance of the affected federal lands to the State. Plaintiffs' members' and supporters' use and enjoyment of the Dalton Highway corridor and adjacent areas previously protected by PLOs 5150 and 5180, and the resources present in and that rely on the area, will be irreparably harmed. The loss of federal subsistence protections, federal wildlife management, and access guarantees across federal lands harms wildlife and Plaintiffs' members' current rights of access and use of these areas, and thus irreparably harms the interests of Plaintiffs and their members and supporters. Plaintiffs and their members and supporters will also be harmed by the opening of affected lands to mining and oil and gas development due to the Secretary's revocation of PLOs 5150 and 5180.

22.     Plaintiffs and their members and supporters also rely on lands and waters adjacent to areas previously protected by PLOs 5150 and 5180 to live, work, visit, hunt, fish, and recreate. This includes Gates of the Arctic. Plaintiffs and their members and supporters will be harmed by the Secretary's withdrawal revocation and forthcoming transfer of land out of federal ownership because Defendants and the State anticipate that the Secretary's actions will expedite the permitting process for the proposed Ambler Road by transferring those lands out of federal ownership. Construction, operation, and

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*N. Alaska Envt'l Ctr. v. Burgum*
Case No. 3:26-cv-00108                                                                 Page 12 of 50

Case 3:26-cv-00108-ACP     Document 1     Filed 03/10/26     Page 12 of 50

use of the Ambler Road would destroy, degrade, and diminish the wild and natural state of this area, would kill, injure, harm, harass, and displace wildlife, and would thus irreparably harm Plaintiffs' interests in Gates of the Arctic and across the southern Brooks Range. The Arctic Refuge is also adjacent to lands that were previously protected by PLOs 5150 and 5180. Plaintiffs' members and supporters have economic, recreational, scientific, environmental, aesthetic, educational, conservation, and other interests in the Arctic Refuge. Plaintiffs' members and supporters enjoy or use wildlife that inhabit the Arctic Refuge and recreate in areas that directly abut the lands subject to the withdrawal revocation. Revocation of PLOs 5150 and 5180, and oil and gas and mining activities enabled by it, will degrade and harm the natural environment and wildlife and habitat used and enjoyed by the Plaintiffs' members and supporters, thereby harming the interests of Plaintiffs' members and supporters. The Secretary's decision also impedes Plaintiffs' members' rights to access both Gates of the Arctic and the Arctic Refuge via the Dalton Highway and surrounding lands for subsistence, recreation, and other purposes.

23. BLM's treatment of the State's topfilings as effective selections in violation of the law causes imminent harm to the interests of the groups and their members. Once those topfiled parcels were treated as valid State selections, they were no longer subject to federal subsistence protections along the corridor, including the federal rural

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*N. Alaska Envt'l Ctr. v. Burgum*
Case No. 3:26-cv-00108                                                    Page 13 of 50

subsistence harvest priority, motorized access for subsistence, and a duty to evaluate and avoid subsistence harm prior to the authorization of new uses or disposals.

24.     Defendants' failure to follow the procedures mandated by law further harmed Plaintiffs' and their members' and supporters' ability to engage in any public process and ensure informed decision making.

25.     These actual, concrete injuries suffered by Plaintiffs and their members and supporters are fairly traceable to the Defendants' revocation of PLOs 5150 and 5180, treatment of the State's topfilings as effective selections, ongoing process to transfer land ownership to the State, and violation of the substantive and procedural protections of various laws. These injuries would be redressed by the relief sought in this case. Plaintiffs therefore file this action on behalf of their members, who are adversely affected by Defendants' actions.

<u>Defendants</u>

26.     Defendant Douglas Burgum is the Secretary of the Interior and is being sued in his official capacity. Secretary Burgum is the official ultimately responsible under federal law for ensuring that the actions and decisions of BLM comply with all applicable laws and regulations. Secretary Burgum is the agency official that signed PLO 7966 (the decision to revoke PLOs 5150 and 5180) and directed BLM to convey the lands formerly subject to these withdrawals to the State.

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*N. Alaska Envt'l Ctr. v. Burgum*
Case No. 3:26-cv-00108                                                         Page 14 of 50

Case 3:26-cv-00108-ACP     Document 1     Filed 03/10/26     Page 14 of 50

27.    Defendant Interior is an agency of the United States responsible for oversight of BLM.

28.    Defendant BLM is an agency within Interior. BLM is responsible for conveying to the State the BLM-managed lands formerly subject to PLOs 5150 and 5180, and for ensuring that the State's selection and land conveyance process complies with all applicable law.

29.    Defendant Kevin Pendergast is the State Director of BLM Alaska and is being sued in his official capacity. Mr. Pendergast is the official responsible for ensuring that his agency's process to support the revocation of PLOs 5150 and 5180 complies with all applicable laws and regulations. Mr. Pendergast is the agency official that signed BLM's DNA and Memorandum of Agreement with the State for purposes of BLM's ANILCA section 810 obligations.

30.    The State of Alaska is a sovereign state. Plaintiffs do not assert any claims or seek affirmative relief against the State. Plaintiffs join the State to facilitate the Court in effectuating Plaintiffs' requested declaratory and injunctive relief — i.e., precluding BLM's treatment of the State's topfiling as valid selections and precluding or potentially vacating Interior's imminent conveyance of BLM-managed lands to the State. *See* FED. R. CIV. P. 19(a); *Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1342–45 (9th Cir. 1995).

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*N. Alaska Envt'l Ctr. v. Burgum*
Case No. 3:26-cv-00108                                                      Page 15 of 50

Case 3:26-cv-00108-ACP    Document 1    Filed 03/10/26    Page 15 of 50

## IV. STATUTORY BACKGROUND

### Alaska Statehood Act

31.     Congress enacted the Alaska Statehood Act (the Statehood Act) in 1958. As part of the Statehood Act, Congress authorized a land grant to the State. Alaska Statehood Act, Pub. L. No. 85-508, § 6, 72 Stat. 339, 340 (1958).

32.     The Statehood Act allows the State to select and the federal government to convey ownership of around 103 million acres of federal land to the State. The State is "entitled to select . . . public lands of the United States in Alaska which are vacant, unappropriated, and unreserved at the time of their selection." *Id.* The State's selections were required to be completed within a certain period of time after Alaska's admission as a state. *Id.*

33.     The Statehood Act requires that, as part of the selection and transfer process, land must be surveyed before a final patent (i.e., the document conveying legal title of property) is issued to the State. *Id.*

### Alaska Native Claims Settlement Act

34.     In 1971, Congress enacted ANCSA to settle all land claims by Alaska Native groups. 43 U.S.C. § 1601. The discovery of oil on the North Slope and the proposal to build TAPS prompted the enactment of ANCSA.

35.     ANCSA broadly extinguished aboriginal land title in Alaska. Among other provisions, the statute also mandated the creation of for-profit Alaska Native

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*N. Alaska Envt'l Ctr. v. Burgum*
Case No. 3:26-cv-00108                                                          Page 16 of 50

corporations. ANCSA provides for each specific regional or village corporation to select federal lands within their legally defined regions to be conveyed to them. It also provides a system through which the State can likewise select lands to fulfill its entitlements pursuant to the Statehood Act.

36.     ANCSA also set out a number of provisions related to land withdrawals. When Congress enacted ANCSA, it withdrew all unreserved lands in Alaska for 90 days to allow the Secretary time to determine whether those lands should remain closed to all forms of appropriation under the public lands laws, including mineral entry and leasing to protect the public interest. 43 U.S.C. § 1616(d)(1). ANCSA section 17(d)(1) states, in relevant part, "the Secretary shall review the public lands in Alaska and determine whether any portion of these lands should be withdrawn under authority provided for in existing law to insure that the public interest in these lands is properly protected." *Id*. Congress explained that such withdrawals "shall require an affirmative act by the Secretary under his existing authority, and the Secretary is authorized to classify or reclassify any lands so withdrawn and to open such lands to appropriation under the public land laws in accord with his classifications." *Id*.

37.     Congress also intended that ANCSA would allow for the expeditious construction and development of TAPS. Related to that goal, ANCSA section 17(c) contains a specific provision that restricts the selection of lands once they are withdrawn for the TAPS Corridor (Corridor):

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*N. Alaska Envt'l Ctr. v. Burgum*
Case No. 3:26-cv-00108                                                    Page 17 of 50

**Prohibition against selection of lands from withdrawn area in event of withdrawal of utility and transportation corridor across public lands.** In the event that the Secretary withdraws a utility and transportation corridor across public lands in Alaska pursuant to his existing authority, the State, the Village Corporations, and the Regional Corporations shall not be permitted to select lands from the area withdrawn.

*Id*. § 1616(c).

<u>Alaska National Interest Land Conservation Act</u>

38. In 1980, Congress enacted ANILCA for two purposes: conservation of public lands and resources and protection of the ability of rural residents to continue a subsistence way of life. 16 U.S.C. § 3101.

39. Because ANCSA contained no protections for subsistence uses on federal lands, Congress included several subsistence protections as part of ANILCA, including a subsistence harvest preference for all rural residents, motorized access for subsistence, and a duty to evaluate and avoid subsistence harm prior to authorization of new uses or disposals. The subsistence protection provisions in ANILCA Title VIII were adopted "to provide the opportunity for rural residents engaged in a subsistence way of life to continue to do so." *Id*. § 3101(c).

40. Congress specifically adopted ANILCA section 810 with the intent to replace, at least partially, hunting and fishing rights that Indigenous residents lost under ANCSA. Under ANILCA section 810, if an agency is considering a proposal to "withdraw, reserve, lease, or otherwise" allow "the use, occupancy, or disposition of

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*N. Alaska Envt'l Ctr. v. Burgum*
Case No. 3:26-cv-00108                                      Page 18 of 50

Case 3:26-cv-00108-ACP    Document 1    Filed 03/10/26    Page 18 of 50

public lands," the agency must first determine the proposed action's impact on subsistence uses. 16 U.S.C. § 3120(a). The agency "shall evaluate the effect of such use, occupancy, or disposition on subsistence uses and needs, the availability of other lands for the purposes sought to be achieved, and other alternatives which would reduce or eliminate the use, occupancy, or disposition of public lands needed for subsistence purposes." *Id.* In doing so, the agency must also consider cumulative impacts. This first part of the agency's analysis is called the "tier-1 analysis."

41. If the agency conducts this tier-1 analysis and determines that the activities will not "significantly restrict subsistence uses," then the agency issues a Finding of No Significant Restriction and section 810's requirements are met. *Id.*

42. If the agency finds that the proposed action would "significantly restrict subsistence uses," the agency may only move forward if it meets ANILCA section 810's substantive requirements. The standard for meeting this threshold is "quite low" and the agency will generally be required to comply with ANILCA section 810's additional mandates if the action may significantly restrict subsistence. *Sierra Club v. Penfold*, 664 F. Supp 1299, 1307 (D. Alaska 1987), *aff'd*, 857 F.2d 1307 (9th Cir. 1988). If the agency makes a positive finding that there may be significant restrictions to subsistence, it must move forward with what's known as a "tier-2 analysis" and provide public notice and hold hearings in potentially affected communities. 16 U.S.C. § 3120(a)(2). The agency can only move forward with authorizing an action if it finds that the restriction on

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*N. Alaska Envt'l Ctr. v. Burgum*
Case No. 3:26-cv-00108                                    Page 19 of 50

subsistence is "necessary [and] consistent with sound public land management principles"; involves the minimum "amount of public lands necessary to accomplish the purposes" of the proposed action; and the agency takes reasonable steps to minimize the adverse impacts to subsistence uses and resources. *Id.* § 3120(a)(1)–(3).

43. ANILCA also clarifies some of the administrative processes for the transfer of land to the State. Section 906 of ANILCA extended the State's selection period by ten years, required the State to prioritize its selections, and opened some withdrawn areas to State selections. ANILCA, Pub. L. No. 96-487, § 906(a)(2), 94 Stat. 2371, 2437 (1980); 43 U.S.C. § 1635. ANILCA required the State to submit its final list of land selections by 1994. Statehood Act, § 6(b) (setting the original deadline for state selections for 1984); ANILCA, § 906(a)(2) (extending the state selection period to 1994).

44. ANILCA allowed the State to "topfile" lands. That allowed the State to note its desire to select lands otherwise precluded from conveyance because they were encumbered by various existing rights or restrictions, including withdrawals, at the time of ANILCA's passage. 43 U.S.C. § 1635(e). A "topfiling" is a "future selection" that would, if otherwise valid, become an effective selection at a future date, i.e., when the land becomes available for selection through the lifting of a withdrawal or the rejection of a competing selection. *See id.*

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*N. Alaska Envt'l Ctr. v. Burgum*
Case No. 3:26-cv-00108                                                        Page 20 of 50

45.    When topfilings become effective selections, they are immediately segregated from other federal lands, and federal subsistence protections no longer apply, even before the lands are conveyed out of federal ownership.

## National Environmental Policy Act

46.    NEPA's twin aims are to ensure that federal agencies take a hard look at the environmental impacts of their proposed actions before taking them and to ensure that agencies provide relevant information to the public so the public can play a role in both the decision-making process and the implementation of the decision. By focusing the agency's attention on the environmental consequences of its proposed action early in the decision-making process, NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after an agency has committed resources. 42 U.S.C. § 4332(2)(C).

47.    NEPA requires that federal agencies prepare a detailed environmental impact statement (EIS) for any major federal action that may significantly affect the quality of the human environment. *Id.*

48.    NEPA requires federal agencies to include a reasonable range of alternatives to the proposed action within an EIS. *Id.* NEPA also requires that an EIS take a hard look at the reasonably foreseeable direct, indirect, and cumulative environmental effects of the alternatives, including the proposed action, as well as the means to mitigate against those adverse environmental consequences. *Id.*

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*N. Alaska Envt'l Ctr. v. Burgum*
Case No. 3:26-cv-00108                                                    Page 21 of 50

49.     If it is unclear whether an action may rise to the level of causing a significant impact, agencies are directed to prepare an environmental assessment (EA). The purposes of an EA are to conduct an abbreviated evaluation of impacts before the agency takes action and to provide a basis for the agency's determination of whether to prepare an EIS or issue a "finding of no significant impact" for the project. *Id.* § 4336(b)(2). The EA must take a hard look at the impacts, and if the agency decides the impacts are not significant, it must supply a convincing statement of reasons why that is the case.

<u>Federal Land Policy and Management Act</u>

50.     In 1976, Congress enacted the Federal Land Policy and Management Act (FLPMA), declaring the policy that

> the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use.

43 U.S.C. § 1701(a)(8).

51.     FLPMA further declares it to be federal policy that "the public lands be retained in Federal ownership, unless as a result of the land use planning procedure provided for in this Act, it is determined that disposal of a particular parcel will serve the national interest." 43 U.S.C. § 1701(a)(1).

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*N. Alaska Envt'l Ctr. v. Burgum*
Case No. 3:26-cv-00108                                    Page 22 of 50

Case 3:26-cv-00108-ACP     Document 1     Filed 03/10/26     Page 22 of 50

52. FLPMA repealed the President's implied authority to withdraw lands. FLPMA, Pub. L. No. 94-579, § 704(a), 90 Stat. 2743, 2792 (1976). All withdrawals in force on the date of enactment of FLPMA remain in force until modified in accordance with FLPMA or other applicable law. *Id.* § 701(c).

53. FLPMA defines "withdrawal" to mean "withholding an area of Federal land from settlement, sale, location, or entry, under some or all of the general land laws, for the purpose of limiting activities under those laws in order to maintain other public values in the area or reserving the area for a particular public purpose or program." 43 U.S.C. § 1702(j).

54. FLPMA section 204 authorizes the Secretary to make, modify, extend, and revoke some withdrawals, but only in accordance with its requirements and limitations. *Id.* § 1714.

55. Congress declared its policy that the Secretary will consider the public's views and assure adequate public participation when administering the public lands and exercising discretionary authority under FLPMA. *Id.* § 1701(a)(5). Public involvement" is defined as "the opportunity for participation by affected citizens in . . . decisionmaking . . . with respect to the public lands." *Id.* § 1702(d).

56. FLPMA section 309(e) mandates that the Secretary "establish procedures" to provide the public with opportunities "to participate in, the preparation and execution of

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*N. Alaska Envt'l Ctr. v. Burgum*
Case No. 3:26-cv-00108                                   Page 23 of 50

Case 3:26-cv-00108-ACP    Document 1    Filed 03/10/26    Page 23 of 50

plans and programs for, and the management of, the public lands." *Id.* § 1739(e). Such

procedures include public hearings and the opportunity to provide comments. *Id.*

Administrative Procedure Act

57. Courts review final agency actions for which no specific judicial review

mechanism is prescribed by statute under the APA. 5 U.S.C. §§ 702, 704.

58. Under the APA, courts "hold unlawful and set aside agency action, findings,

and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not

in accordance with law," in excess of statutory authority, or made "without observance of

procedure required by law." *Id.* § 706(2)(A), (C)–(D).

59. An agency must articulate a satisfactory explanation for its conclusions.

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43

(1983).

60. When an agency reverses a prior decision, the agency is "obligated to supply

a reasoned analysis for the change." *Id.* at 42. An agency change in position is arbitrary

and capricious under the APA unless the agency

> (1) displays "awareness that it is changing position," (2) shows that "the
> new policy is permissible under the statute," (3) "believes" the new policy
> is better, and (4) provides "good reasons" for the new policy, which, if the
> "new policy rests upon factual findings that contradict those which
> underlay its prior policy," must include "a reasoned explanation . . . for
> disregarding facts and circumstances that underlay or were engendered by
> the prior policy."

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*N. Alaska Envt'l Ctr. v. Burgum*
Case No. 3:26-cv-00108                                              Page 24 of 50

*Organized Village of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) (en

banc) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009)).

## V.    FACTS

61.    One of Congress's major goals in the adoption of ANCSA was facilitating

the development of TAPS. The Dalton Highway, built in the 1970s to allow for the

construction of the pipeline, stretches from Livengood (84 miles north of Fairbanks) to

Deadhorse and the oilfields of Prudhoe Bay.

62.    In 1971, the Secretary issued PLO 5150 pursuant to section 17(c) of ANCSA

to reserve the land for the Dalton Highway and TAPS. Public Land Order 5150, 36 Fed.

Reg. 25410 (Dec. 31, 1971). PLO 5150 specifically withdrew some of the lands along the

Corridor from mineral entry and prohibited selection of these lands by the State or

ANCSA corporations. *Id.* The Secretary stated that this withdrawal would reserve the

lands as a utility and transportation corridor pursuant to ANCSA 17(c). *Id.*

63.    In 1972, the Secretary issued PLO 5180 pursuant to section 17(d)(1) of

ANCSA, removing these lands from all forms of appropriation to protect the public

interest. Public Land Order 5180, 37 Fed. Reg. 5583 (March 16, 1972). PLO 5180 as

originally issued largely overlaps the lands withdrawn by PLO 5150. *Id.* at 5584

(explaining that PLO 5180 covers enumerated lands in addition to all lands listed in PLO

5150). By withdrawing these same PLO 5150 lands under PLO 5180, the Secretary

recognized it was in the public interest to protect those lands.

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*N. Alaska Envt'l Ctr. v. Burgum*
Case No. 3:26-cv-00108                                                    Page 25 of 50

64. In 1977, construction of TAPS was completed and significant oil production began on the North Slope. TAPS and the Dalton Highway are parallel to each other and form a transportation corridor extending through northern Alaska.

65. The Corridor crosses the region's rolling, forested hills, across the Yukon River and Arctic Circle, through the rugged Brooks Range, and over the North Slope to the Arctic Ocean. The Corridor and its surrounding lands are profoundly important to Alaska's wildlife and people. The region supports 25 fish species, including salmon. 1 BUREAU OF LAND MGMT., U.S. DEP'T OF THE INTERIOR, CENTRAL YUKON RESOURCE MANAGEMENT PLAN, FINAL ENVIRONMENTAL IMPACT STATEMENT 3-80 (2024) [hereinafter CYRMP FEIS]. It also provides habitat for eagles, moose, caribou, Dall sheep, beaver, bears, gray wolves, "muskoxen, migratory birds, pollinators, and various furbearer species." *Id*. at 3-94. Wildlife habitat within the region is "relatively undisturbed," except for lands adjacent to the Corridor and near small-scale mining activities. *Id*.

66. Many "important subsistence resources are found in the [region], most notably caribou, moose, Dall sheep, Chinook, and chum salmon, and sheefish." 3 *id*. app. Q, at 2. Communities in the region also rely on the harvest of berries, bears, and furbearers, to meet their needs. *Id*.

67. A number of rural communities along and close to the Corridor rely on the area's resources for subsistence use, their culture, and their traditional way of life. This

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*N. Alaska Envt'l Ctr. v. Burgum*
Case No. 3:26-cv-00108                                                          Page 26 of 50

includes the communities of Allakaket, Anaktuvuk Pass, Bettles, Coldfoot, Evansville, Rampart, Stevens Village, Wiseman, and other residents living within or near the Corridor. 1 *id*. at 3-234 to 3-235. For decades, ANILCA has ensured these communities enjoy federal subsistence protections along the Corridor, including harvest priority and motorized access under ANILCA section 811 and Federal Subsistence Management regulations, as well as the ANILCA section 810 subsistence protections relating to disposals or uses of public land.

68.     Because of its incredible recreational, scenic, and wildlife values and relatively easy access, the Corridor is also popular for a wide range of recreational uses. BLM has identified multiple areas with "outstanding scenic quality" near the Corridor. *Id*. at 3-136. The region supports a wide range of recreational activities, including but not limited to sightseeing, history, motorcycle, and bicycle tours; backcountry travel and hiking; camping; berry picking; photography; fishing and hunting; river trips; and dog mushing. *Id*. at 3-177, 3-184.

69.     Over the last sixty years, pursuant to the Statehood Act, BLM has transferred about 98 million acres to the State, and the State is entitled to about 5 million more. Decl. of Erika L. Reed at 3–4, *Alaska v. Haaland*, No. 3:21-cv-00158-HRH, 2022 U.S. Dist. LEXIS 44142 (D. Alaska Mar. 14, 2022), ECF No. 12-1.

70.     After the enactment of ANILCA, the State topfiled many lands along the Corridor. ANCSA section 17(c), however, prohibits the topfiled lands encompassed by

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*N. Alaska Envt'l Ctr. v. Burgum*
Case No. 3:26-cv-00108                                                          Page 27 of 50

PLO 5150 from becoming effective selections. PLOs 5150 and 5180 also withdrew the lands along the Corridor from the operation of the public land laws and thus prevented them from being opened to mining and oil and gas development.

71.    For decades, BLM has repeatedly refused to recommend lifting the PLO 5150 and 5180 withdrawals. For example, in 1991, BLM released the Utility Corridor ROD to govern management of BLM-managed lands along the corridor. BLM stated that the PLO 5150 Corridor "is an essential component of the national domestic oil and gas transportation system. It provides a route to transport a significant portion of the nation's petroleum; the present and future importance of access to these resources cannot be overstated." BUREAU OF LAND MGMT., DEP'T OF THE INTERIOR, UTILITY CORRIDOR RESOURCE MANAGEMENT PLAN/ ENVIRONMENTAL IMPACT STATEMENT RECORD OF DECISION 1 (1991).

72.    In 2006, BLM provided a report to Congress pursuant to the Alaska Land Transfer Acceleration Act. That report recommended retaining the nearly 2 million acres of ANCSA (d)(1) withdrawals that overlap with PLO 5150 and the Corridor. BUREAU OF LAND MGMT., U.S. DEP'T OF THE INTERIOR, SEC. 207 ALASKA LAND TRANSFER ACCELERATION ACT: A REVIEW OF D-1 WITHDRAWALS 9 (2006).

73.    The lands at issue in this matter are within BLM's Central Yukon planning area. In 2024, BLM issued a final EIS and record of decision (ROD) for the Central Yukon Resource Management Plan (Central Yukon RMP) to guide land management for

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*N. Alaska Envt'l Ctr. v. Burgum*
Case No. 3:26-cv-00108                                                      Page 28 of 50

the Central Yukon planning area. Central Yukon RMP FEIS; BUREAU OF LAND MGMT., U.S. DEP'T OF THE INTERIOR, CENTRAL YUKON RECORD OF DECISION AND APPROVED RESOURCE MANAGEMENT PLAN (2024) [hereinafter Central Yukon RMP ROD].

74.     BLM considered six alternatives in the Central Yukon RMP, including four alternatives that recommended partially or fully lifting PLOs 5150 and 5180.

75.     BLM's 2024 Central Yukon RMP ROD selected an alternative that recommended retaining the PLO 5150 withdrawal in its entirety. BLM determined that "the primary purpose of the lands withdrawn by PLO 5150 is to serve as a utility and transportation corridor and PLO 5150 is still fulfilling that purpose." Central Yukon RMP ROD at 1-9. BLM explained that, following revocation and conveyance to the State, "BLM cannot guarantee that an area will be open to subsistence use or that access across the land to other federally managed land will be allowed." *Id.* at 1-18. In addition, "conveyance of [State] selections within 5 miles of the Dalton Highway would restrict public access, including the access for federally qualified subsistence users to public lands." *Id.*

76.     BLM's 2024 Central Yukon RMP ROD recommended that the Secretary partially revoke approximately 11 million acres of ANCSA 17(d)(1) withdrawals for the limited purpose of allowing the selection of Native allotments by Alaska Native Vietnam-era veterans in compliance with recently passed legislation. Central Yukon RMP ROD at 1-8. This included a portion of the lands withdrawn via PLO 5180. *Id.* at 2-31. However,

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*N. Alaska Envt'l Ctr. v. Burgum*
Case No. 3:26-cv-00108                                                      Page 29 of 50

Case 3:26-cv-00108-ACP    Document 1    Filed 03/10/26    Page 29 of 50

"due to the environmental impacts" identified in BLM's final EIS, BLM "only propose[d] to revoke the ANCSA 17(d)(1) withdrawals outside of the PLO 5150 corridor." *Id.* at 1-18. In other words, to the extent that BLM recommended revoking portions of PLO 5180 withdrawals for veterans' allotments, none of the recommended revocations applied to areas subject to PLO 5150. Prior to the Secretary's decision revoking PLO 5150, there has never been an attempt to revoke the withdrawals put in place under ANCSA section 17(c).

77.   Regarding BLM's recommendation to largely maintain ANCSA 17(d)(1) withdrawals across Alaska, BLM stated that these withdrawals "may be left in place after land use planning is complete if they are necessary to protect the public interest in these lands." *Id.* at 1-18. BLM recommended only a limited revocation of ANCSA 17(d)(1) withdrawals to allow for Vietnam-era veterans to select allotments, and otherwise recommended broadly retaining withdrawals based on "the public interest in the rural resident preference rights for subsistence under Title VIII of ANILCA, protection of Dall Sheep and its habitat, protection of relevant and important [Area of Critical Environmental Concern] values, and protection of the known and unknown cultural and historical resources in the planning area." *Id.*

78.   BLM also explained that its recommendation to retain the PLO 5150 and 5180 withdrawals was based on its finding that the covered lands "would likely become open to mineral entry and mineral leasing, as well as other land uses not allowed under

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*N. Alaska Envt'l Ctr. v. Burgum*
Case No. 3:26-cv-00108                                                     Page 30 of 50

Case 3:26-cv-00108-ACP     Document 1     Filed 03/10/26     Page 30 of 50

current federal management. After conveyance, the State lands would be open to mineral development that would likely result in impacts on surface resources." *Id.* at 1-17.

79.    BLM separately explained "that it is in the public interest to continue the protection afforded by the ANCSA section 17(d)(1) withdrawals for the lands within the planning area, particularly with regard to ensuring subsistence access and maintenance of subsistence resources," and that "revocation of the PLO 5150 and ANCSA section 17(d)(1) withdrawals would have significant environmental impacts and impacts to the public interest." BLM Director's Response to the State of Alaska Governor's Appeal of the BLM Alaska State Director's Governor's Consistency Review Determination for the Central Yukon Resource Management Plan and Final Environmental Impact Statement, 90 Fed. Reg. 1186, 1188 (Jan. 7, 2025).

80.    In the context of the RMP process, BLM also conducted its required tier-1 analysis under ANILCA section 810 to determine whether the RMP and its land use planning decisions would significantly restrict subsistence uses. BLM explained that if PLO 5150 lands were converted to State selections or conveyed to the State, this would greatly impact subsistence use for the residents of Coldfoot, Wiseman, Alatna, Allakaket, Anaktuvuk Pass, Bettles, Evansville, and Stevens Village, and other residents within or near the Corridor. 1 Central Yukon RMP FEIS at 3-235. BLM explained that "[r]esidents of Coldfoot and Wiseman would not retain" rights for "motorized access to subsistence resources on conveyed lands or lands with effective State selections." *Id*. Alatna,

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*N. Alaska Envt'l Ctr. v. Burgum*
Case No. 3:26-cv-00108                                                    Page 31 of 50

Case 3:26-cv-00108-ACP     Document 1     Filed 03/10/26     Page 31 of 50

Allakaket, Anaktuvuk Pass, Bettles, Evansville and Stevens Village would be impacted because it would cut off federal law allowing those residents to use firearms for subsistence use within the Corridor. *Id.* BLM specifically noted that firearm use for subsistence purposes "was determined to be needed for residents of Coldfoot and Wiseman," but these rights would be lost if PLO 5150 lands were conveyed to the State. *Id.* BLM also acknowledged that competition between local and non-local hunters would increase in areas that are accessible from the Dalton Highway, and that Dall sheep habitat could be significantly impacted from full or partial revocation of PLO 5150. *Id.*

81.    BLM ultimately determined that its selected alternative was the "only alternative that would not result in significant restrictions (of the non-cumulative case) of subsistence use because it does not recommend that the Secretary revoke . . . PLO 5150." Central Yukon RMP ROD at 1-15. BLM did not go make any tier-2 determinations for purposes of ANILCA section 810 because it did not recommend lifting PLO 5150 in the Central Yukon RMP ROD.

82.    In January 2025, President Trump issued an Executive Order directing the Secretary to "evaluate changes to, including the potential rescission of, [PLO] 5150." Exec. Order No. 14153, 90 Fed. Reg. 8347, 8348 (Jan. 29, 2025).

83.    The Secretary subsequently directed agency staff to develop an action plan outlining the necessary steps to implement the President's Executive Order regarding the withdrawal revocation. Sec'y of the Interior, Order No. 3422, at 2 (Feb. 3, 2025).

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*N. Alaska Envt'l Ctr. v. Burgum*
Case No. 3:26-cv-00108                                                  Page 32 of 50

84. In July 2025, BLM indicated that it would begin taking steps to support the Secretary's revocation of PLOs 5150 and 5180 and to potentially allow for the conveyance of these lands to the State. BLM created a project page on its NEPA Register website stating that revoking PLOs 5150 and 5180 would open the area to mineral entry and leasing and transform the State's topfilings into effective selections. *Revocation of Public Land Orders 5150 and 5180, North of Yukon River*, BUREAU OF LAND MGMT. https://eplanning.blm.gov/Project-Home/?id=e34e2bf5-a7f2-f011-8407-001dd803d7d3 (last visited Mar. 9, 2026). BLM stated that it planned to post a DNA in the fall of 2025 to inform the Secretary's decision regarding the PLOs.

85. In October 2025, Congress passed a joint resolution disapproving the Central Yukon RMP ROD pursuant to the Congressional Review Act, which President Trump later signed into law.  Joint Resolution of Dec. 11, 2025, Pub. L. No. 119-50, 139 Stat. 699.

86. BLM did not conduct a full ANILCA section 810 process following its announcement that it would take steps to support the Secretary's revocation of PLOs 5150 and 5180. BLM held no hearings pursuant to ANILCA or NEPA and did not otherwise undertake any public processes pursuant to FLPMA's requirements.

87. On February 23, 2026, BLM posted a "Decision Rationale" on its NEPA Register website purporting to explain the Secretary's decision to revoke PLOs 5150 and 5180, which was signed by the Secretary on February 20. DOUG BURGUM, SEC'Y OF THE

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*N. Alaska Envt'l Ctr. v. Burgum*
Case No. 3:26-cv-00108

INTERIOR, DECISION RATIONALE FOR REVOCATION OF PUBLIC LAND ORDER NO. 5150 AND 5180 IN THE DALTON UTILITY CORRIDOR NORTH OF YUKON RIVER (Feb. 20, 2026) [hereinafter Decision Rationale]. BLM also posted a DNA on its NEPA Register website. BLM did not prepare an EA or an EIS pursuant to NEPA for its new decision.

88.    The Secretary stated in the Decision Rationale that revoking the withdrawal would open the area to location and entry under the public land and mining laws. He further stated that the revocation would allow 2,066,000 acres of topfiled lands to become valid State selections, while the remaining 61,845 acres within the Dalton Utility Corridor, which were not topfiled by the State, would remain subject to federal subsistence protections. *Id*. at 1.

89.    The Secretary only cited FLMPA section 204 as the basis for his authority to revoke PLOs 5150 and 5180 in the Decision Rationale. *Id*.

90.    The Secretary relied on BLM's DNA and the Central Yukon RMP EIS to support the withdrawal revocation. He stated that the impacts of revoking PLOs 5150 and 5180 were adequately analyzed in the Central Yukon RMP EIS for purposes of NEPA compliance. *Id*.

91.    The Secretary also purported to summarize BLM's efforts regarding National Historic Preservation Act section 106 consultation and government-to-government consultation with Tribes.

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*N. Alaska Envt'l Ctr. v. Burgum*
Case No. 3:26-cv-00108                                                    Page 34 of 50

Case 3:26-cv-00108-ACP    Document 1    Filed 03/10/26    Page 34 of 50

92.     The Secretary stated that, despite BLM previously declining to recommend withdrawal revocation in the Central Yukon RMP ROD, revoking the withdrawals "would provide a more favorable economic development environment to impact the growth of jobs and labor income" than leaving the withdrawals in place. *Id*. at 3. He stated that "the potential economic benefits to the State of Alaska and the Nation outweigh the potential for environmental impact." *Id*. The Secretary identified the following as economic benefits: increasing the State's management and control of TAPS, "support[ing] the way forward for the proposed Ambler Road and Alaska [LNG] pipeline," and securing State access to the Ray Mountains to mine for rare earth minerals. *Id*.

93.     The Secretary further stated that Congress's disapproval of the Central Yukon RMP ROD via the Congressional Review Act "confirms that the recommendations on the RMP to retain PLO 5150 are not consistent with the policy direction of Congress or this Administration and need to be changed." *Id*. at 4.

94.     The Secretary also cited other Executive Orders as supporting his decision, on the basis that these orders illustrate the Administration's goals to prioritize mineral production. *Id*.

95.     The Secretary did not address the fact that the PLO 5150 withdrawal is still serving the purposes for which it was established — namely, the TAPS and Dalton Highway Corridor.

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*N. Alaska Envt'l Ctr. v. Burgum*
Case No. 3:26-cv-00108                                                     Page 35 of 50

Case 3:26-cv-00108-ACP     Document 1     Filed 03/10/26     Page 35 of 50

96.     The Secretary further relied on the Central Yukon RMP process and findings for purposes of complying with BLM's obligations under ANILCA section 810(a) and BLM's required tier-1 findings. The Secretary's Decision Rationale included an attachment (Attachment A) summarizing BLM's prior findings and providing "new determinations for the proposed revocation of PLOs within the Dalton Utility Corridor, as required by ANILCA Section 810(a)(3)." *Id.* at 2.

97.     Regarding impacts to subsistence users and resources from revoking PLO 5150, the attachment acknowledged that BLM previously determined that "Alatna, Allakaket, Anaktuvuk Pass, Arctic Village, Bettles, Coldfoot, Evansville, Galena, Hughes, Huslia, Kaltag, Koyukuk, Lake Minchumina, Manley Hot Springs, Minto, Nenana, Nuiqsut, Nulato, Rampart, Ruby, Stevens Village, Tanana, Venetie, and Wiseman" may experience reductions in the availability of subsistence resources. *Id.* attach. A, at 2–3. It further noted BLM's previous determination that that the communities of Alatna, Allakaket, Anaktuvuk Pass, Arctic Village, Bettles, Coldfoot, Evansville, Galena, Hughes, Huslia, Kaltag, Koyukuk, Lake Minchumina, Manley Hot Springs, Minto, Nenana, Nuiqsut, Nulato, Rampart, Ruby, Stevens Village, Tanana, Venetie, and Wiseman may experience significant restrictions to subsistence uses due to limitations on access. *Id.* The impacts specifically acknowledged include that federal hunting and fishing regulations would no longer apply, federally qualified subsistence users could no longer use firearms to hunt in parts of their traditional subsistence use

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*N. Alaska Envt'l Ctr. v. Burgum*
Case No. 3:26-cv-00108                                                   Page 36 of 50

Case 3:26-cv-00108-ACP     Document 1     Filed 03/10/26     Page 36 of 50

areas, and subsistence users would lose their rights to use off-highway vehicles and rights to access subsistence use areas. *Id.* attach. A, at 3.

98.    The Decision Rationale explained that BLM did not provide a tier-1 determination in the Central Yukon RMP because BLM did not, at that time, recommend revocation of PLOs 5150 and 5180. The document explained that the "reduction in the availability of subsistence resources and limitations on subsistence user access, due to revoking PLOs 5150 and 5180 within the Dalton Utility Corridor, may significantly restrict subsistence uses for the communities of Alatna, Allakaket, Anaktuvuk Pass, Coldfoot, Bettles, Evansville, Stevens Village, and Wiseman." *Id.* attach. A, at 4. There is no explanation regarding BLM's prior findings of significant restrictions on additional communities — i.e., Arctic Village, Galena, Hughes, Huslia, Kaltag, Koyukuk, Lake Minchumina, Manley Hot Springs, Minto, Nenana, Nuiqsut, Nulato, Rampart, Ruby, Tanana, and Venetie.

99.    The Decision Rationale stated that BLM had complied with ANILCA section 810's procedural requirements because the agency previously provided notice and hearings in affected communities during the Central Yukon RMP process.

100.    Attachment A stated that full revocation of PLOs 5150 and 5180 is necessary and consistent with sound management principles for the utilization of public lands because revocation would encourage resource development, implement the Alaska Statehood Act, and would further the goals and objectives laid out in Executive Order

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*N. Alaska Envt'l Ctr. v. Burgum*
Case No. 3:26-cv-00108                                                       Page 37 of 50

14153 and Secretarial Order 3422. *Id.* attach. A, at 4–5. The document stated that revoking all PLOs would involve the minimal amount of public lands necessary to accomplish the proposed use and disposition because it would increase the State's control of the Corridor and facilitate the development of the proposed Ambler Road and proposed Alaska LNG pipeline. *Id.* attach. A, at 5.

101.    The Secretary stated that BLM had worked with the State to take "reasonable steps to minimize the adverse impacts on subsistence uses and resources from this revocation." *Id*. attach. A, at 4. He stated a Memorandum of Agreement outlining these steps was included as Attachment B to his Decision Rationale. *Id.* Attachment A stated that BLM relied on the State's commitment, as captured in Attachment B to the Decision Rationale, to voluntarily undertake a process to identify and establish easements for subsistence access. *Id.* attach. A, at 5–6. BLM claimed it "rel[ied] on these commitments in its determination that reasonable steps will be taken to minimize the adverse impacts upon Federal subsistence uses." *Id.* attach. A, at 6.

102.    The Memorandum of Agreement contained in Attachment B was not initially included with the Decision Rationale, but was later uploaded to BLM's NEPA Register on February 25, following public inquiry. The Memorandum of Agreement notes that BLM will "prioritize timely conveyance of title to lands requested by the State upon revocation of PLOs 5150 and 5180, and subsequent opening order which would allow topfiled selections to become effective selections." *Id.* attach. B, at 4.

_____

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*N. Alaska Envt'l Ctr. v. Burgum*
Case No. 3:26-cv-00108                                                      Page 38 of 50

103.    The Memorandum of Agreement encourages the State to engage with subsistence users and undertake a process to identify and establish easements in the future to minimize impacts on subsistence users. *Id.* attach. B, at 3–4. The Memorandum of Agreement is non-binding and does not commit the State to taking any concrete actions with regard to authorizing access for subsistence users, and it does not purport to address impacts to subsistence users other than those related to the possible identification of easements.

104.    In the DNA, BLM concluded that the Central Yukon RMP "fully covers the proposed action and constitutes BLM's compliance with the requirements of the NEPA." BUREAU OF LAND MGMT., U.S. DEP'T OF THE INTERIOR, DOI-BLM-AK-F030-2025-0022-DNA, DETERMINATION OF NEPA ADEQUACY 8 (2026) [hereinafter DNA].

105.    The DNA briefly summarized BLM's NEPA process for the Central Yukon RMP, the alternatives considered, a bulleted list of resource impacts considered, and BLM's public outreach.

106.    BLM noted that revoking PLOs 5150 and 5180 "would open approximately 2,127,845 acres to location and entry under the public land and mining laws," in addition to allowing for State-selected lands to become valid selections open to conveyance to the State. DNA at 1.

107.    Regarding subsistence impacts, BLM noted that "State law prohibits the use of firearms to hunt and the operation of off-highway vehicles within five miles of the

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*N. Alaska Envt'l Ctr. v. Burgum*
Case No. 3:26-cv-00108                                              Page 39 of 50

Case 3:26-cv-00108-ACP     Document 1     Filed 03/10/26     Page 39 of 50

right-of-way of the Dalton Highway, which would affect access to subsistence use areas on adjacent public lands." *Id*.

108.    BLM noted that the Central Yukon RMP EIS did not evaluate the impacts of revoking PLO 5180. BLM stated that "PLO 5150 and PLO 5180 overlap within the Dalton Utility Corridor and therefore the effects for revoking PLO 5150 are the same as the effects of revoking PLO 5180." *Id*. at 3.

109.    Regarding changes to environmental conditions, BLM stated that the State recently revised its priorities for its remaining Statehood Act selections along the Corridor. *Id*. at 5. As a result, BLM's assumption in the Central Yukon RMP — that, if the withdrawals were revoked, only the State's high priority land selections would transfer out of federal ownership within 10 years — has changed. *Id*. In other words, many more acres of lands along the corridor would transfer out of federal ownership much sooner than BLM previously assumed. BLM did not specify the changed acreage in the State's priorities or how much sooner conveyance might occur. Nonetheless, BLM broadly stated that this reprioritization did not affect its conclusions regarding any environmental impacts. *Id*.

110.    BLM stated that it previously assumed withdrawal revocation would restrict subsistence use on 650,000 acres of federal land, but now found that about 1,600,000 acres would be subject to significant restrictions. *Id*. BLM acknowledged that this change "greatly increases the acreage impacted," but stated that "the change in

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*N. Alaska Envt'l Ctr. v. Burgum*
Case No. 3:26-cv-00108                                                                 Page 40 of 50

quantity of acreage would not change the result that revocation would restrict the ability of these communities to engage in subsistence." *Id.*

111.    On February 25, 2026, the Secretary's decision to issue a new PLO, PLO 7966, revoking PLOs 5150 and 5180 was published in the Federal Register. Public Land Order No. 7966, 91 Fed. Reg. 9293 (Feb. 25, 2026).

112.    The Secretary stated PLO 7966 partially revokes PLOs 5150 and 5180 insofar as they affect approximately 2,127,845 acres of public land. *Id.* The Secretary relied on his authority under FLPMA section 204 and ANCSA section 17(d)(1) to support the revocation. *Id.* at 9293–9294.

113.    The Secretary indicated that the lands previously withdrawn under PLOs 5150 and 5180 would be open for mineral entry and mining effective March 27, 2026. *Id.* at 9295.

## CLAIMS FOR RELIEF

### Count I: Violation of ANCSA Section 17(c)

114.    Plaintiffs incorporate by reference all preceding paragraphs.

115.    In 1971, pursuant to ANSCA Section 17(c), the Secretary withdrew lands to establish the Corridor via PLO 5150. Since that time, the Dalton Highway and TAPS were constructed and have continued to operate.

116.    Secretary Burgum partially revoked PLO 5150 and directed that the lands subject to the withdrawal be open to all forms of appropriation under the general public

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*N. Alaska Envt'l Ctr. v. Burgum*
Case No. 3:26-cv-00108

Case 3:26-cv-00108-ACP    Document 1    Filed 03/10/26    Page 41 of 50

land laws. The Decision Rationale directs that the withdrawal revocation will allow the State's approximately 2,066,000 acres of topfiled land to become effective State selections. In other words, Secretary Burgum directed BLM to treat the State's topfilings over lands withdrawn pursuant to ANSCA section 17(c) as having become effective selections, thus allowing conveyance to the State.

117.    ANCSA section 17(c) prohibits the State and other entities from making effective land selections once the Secretary effectuates a withdrawal for purposes of establishing and operating the Corridor. 43 U.S.C. § 1616(c). The plain language of ANCSA section 17(c) does not allow for withdrawal revocation or State selection thereafter. *Id*.

118.    ANILCA section 906(e) allows the State to topfile lands which could not be immediately transferred, but which would pass into State ownership if the lands later become "available" and only if such selections are "otherwise valid." *Id.* § 1635(e). ANILCA section 906 does not alter ANCSA section 17(c)'s statutory prohibition on State selection. The State's topfilings are therefore not "otherwise valid" and cannot be treated as effective selections.

119.    Secretary Burgum's Decision Rationale, which treats the State's topfilings of lands previously subject to PLO 5150 as effective selections, contravenes ANCSA section 17(c). Defendants have otherwise failed to show that the Secretary's revocation of PLO 5150 is permissible under federal law. This renders the Secretary's decision

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*N. Alaska Envt'l Ctr. v. Burgum*
Case No. 3:26-cv-00108                                                          Page 42 of 50

Case 3:26-cv-00108-ACP     Document 1     Filed 03/10/26     Page 42 of 50

"arbitrary, capricious, an abuse of discretion, . . . otherwise not in accordance with law," and "without observance of the procedure required by law." 5 U.S.C. § 706(2).

## Count II: Violation of ANCSA Section 17(d)(1)

120.     Plaintiffs incorporate by reference all preceding paragraphs.

121.     In 1972, the Secretary withdrew lands via PLO 5180 to protect the public interest, pursuant to ANSCA section 17(d)(1).

122.     Secretary Burgum partially revoked PLO 5180 in part by relying on assertions that revoking PLO 5180 would respond to Executive Order 14153 and Secretarial Order 3422, increase the State's control of the Corridor, streamline construction and operation of the proposed Ambler Road and the proposed Alaska LNG pipeline, and encourage mining exploration. The Secretary stated that "the potential economic benefits to the State of Alaska and the Nation outweigh the potential for environmental impact," but did not otherwise explain or discuss how he determined the public interest would be protected. Decision Rationale at 3.

123.     Pursuant to ANCSA section 17(d)(1), the Secretary cannot revoke these withdrawals unless and until the Secretary determines that the public interest is protected. 43 U.S.C. § 1616(d)(1).

124.     Defendants failed to show that that revoking PLO 5180 protects the public interest as mandated by ANCSA section 17(d)(1), which renders the Secretary's decision

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*N. Alaska Envt'l Ctr. v. Burgum*
Case No. 3:26-cv-00108                                                    Page 43 of 50

Case 3:26-cv-00108-ACP    Document 1    Filed 03/10/26    Page 43 of 50

"arbitrary, capricious, an abuse of discretion, . . . otherwise not in accordance with law," and "without observance of the procedure required by law." 5 U.S.C. § 706(2).

## Count III: Violation of FLPMA and the APA

125.    Plaintiffs incorporate by reference all preceding paragraphs.

126.    In FLPMA, Congress established the national policy that the public lands should be managed to protect the lands' "scientific, scenic, historical, ecological, environmental, . . . and archeological values," as well as and to "provide for outdoor recreation and human occupancy and use." 43 U.S.C. § 1701(a)(8). Congress further requires that federal lands should be maintained in federal ownership unless disposal is in the national interest. *Id.* § 1701(a)(1). Congress further provided that the Secretary may make, modify, extend, and revoke some withdrawals but only in accordance with its requirements and limitations. *Id.* § 1714.

127.    Separately, FLPMA mandates that the Secretary provide opportunities for public participation in the management of public lands. *See, e.g.*, *id.* § 1739(e).

128.    The Secretary's decision partially revoking PLOs 5150 and 5180 violates FLPMA in numerous ways, including but not limited to the fact that the decision fails to adequately discuss the negative environmental and ecological impacts that would result, fails to explain why revocation is in the best interest of the Nation, fails to address how withdrawal revocation is appropriate given that the withdrawal is still serving the purposes for which it was established, and fails to address how eliminating or severely

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*N. Alaska Envt'l Ctr. v. Burgum*
Case No. 3:26-cv-00108                                              Page 44 of 50

Case 3:26-cv-00108-ACP    Document 1    Filed 03/10/26    Page 44 of 50

harming many existing forms of human use, including by significantly restricting

subsistence uses, is consistent with FLPMA's mandates.

129. Defendants failed to provide an opportunity for public comment, public

hearings, or any other opportunity for public participation in advance of the Secretary's

decision to revoke PLOs 5150 and 5180.

130. Defendants' failure to comply with FLPMA renders the Secretary's

revocation decision "arbitrary, capricious, . . . not in accordance with the law," and

without observance of the procedure required by FLPMA and the APA. 5 U.S.C. §

706(2).

## Count IV: Violation of ANILCA Section 810

131. Plaintiffs incorporate by reference all preceding paragraphs.

132. Pursuant to ANILCA section 810, agencies must consider effects and

restrictions upon subsistence resources and uses. If the action may significantly restrict

subsistence uses, the agency must provide public notice and hold hearings in potentially

affected communities. 16 U.S.C. § 3120(a)(2). Actions that would significantly restrict

subsistence uses may only be undertaken if BLM finds that such actions are necessary,

involve the minimal amount of public lands necessary, and if the adverse effects to

subsistence are minimized. *Id.* § 3120(a).

133. BLM failed to undertake the processes mandated by ANILCA section 810

prior to the Secretary revoking PLO 5150 and 5180 in numerous ways, which include but

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*N. Alaska Envt'l Ctr. v. Burgum*
Case No. 3:26-cv-00108

Page 45 of 50

are not limited to the following failures. First, BLM did not hold hearings in affected communities despite acknowledging that revoking PLO 5150 and 5180 may significantly restrict subsistence use. Instead, the Secretary relied on public meetings that BLM had held years earlier for the Central Yukon RMP process to claim these procedural obligations were satisfied. Those prior processes are insufficient to excuse BLM from needing to comply with section 810 for purposes of this decision. Second, BLM did not explain why it eliminated communities that it had previously found would experience significant restrictions on subsistence use if PLO 5150 were revoked. Third, BLM did not address how revoking the withdrawals would impact far more acres of land used for subsistence than previously analyzed. Fourth, BLM failed to consider revoking the withdrawals on a smaller extent of lands to minimize impacts on subsistence. Fifth, BLM failed to evaluate wildlife and environmental impacts, which could in turn impact subsistence. Finally, BLM relied on unspecified and non-binding mitigation measures to be implemented by the State at a to-be-determined future time to conclude its tier-2 obligations were satisfied.

134. Defendants' partial revocation of PLOs 5150 and 5180 without undertaking ANILCA section 810's mandatory procedures, and BLM's failure to adequately consider impacts and take reasonable steps to minimize those impacts on subsistence users and resources, were "arbitrary, capricious, . . . not in accordance with the law," and without

_____

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*N. Alaska Envt'l Ctr. v. Burgum*
Case No. 3:26-cv-00108                                                    Page 46 of 50

Case 3:26-cv-00108-ACP     Document 1     Filed 03/10/26     Page 46 of 50

observance of the procedure required by ANILCA, its implementing regulations, and the APA. 5 U.S.C. § 706(2).

## Count V: Violation of the APA

135.    Plaintiffs incorporate by reference all preceding paragraphs.

136.    When an agency changes policy or course, it must "supply a reasoned analysis for the change." *Motor Vehicles Mfrs. Ass'n of the U.S.*, 463 U.S. at 42. More specifically, it must acknowledge the change in course, show that the new rule is permissible under the statute, express that it is a better policy, and provide good reasons for the change in policy. *Fox Television Stations*, 556 U.S. at 515–16; *Organized Village of Kake*, 795 F.3d at 966. When reversing a policy, "an agency may not simply discard prior factual findings without a reasoned explanation." *Organized Village of Kake*, 795 F.3d at 968. Instead, when a policy change rests on new factual findings that contradict prior findings and circumstances, the agency must "provide a more detailed justification than what would suffice for a new policy created on a blank slate." *Fox Television Stations*, 556 U.S. at 515–16; *see also Organized Village of Kake*, 795 F.3d at 966.

137.    Since 1991, BLM has repeatedly refused to recommend lifting the PLO 5150 and 5180 withdrawals. As recently as 2024, BLM determined that maintaining the PLO 5150 and 5180 withdrawals was necessary to protect the public interest. BLM also found that PLO 5150 was still fulfilling the purposes for which the withdrawal was established by providing for the Corridor. BLM previously declined to recommend that

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*N. Alaska Envt'l Ctr. v. Burgum*
Case No. 3:26-cv-00108

the Secretary revoke PLOs 5150 and 5180, finding that doing so would cause significant restrictions on subsistence use and would cause serious harm to subsistence users and resources in the region, among other reasons.

138.    In 2026, Secretary Burgum failed to address BLM's prior finding that the Corridor should be retained in federal ownership because it is still fulfilling the purposes for which it was established. In relying on generalized and unsupported statements regarding the need for economic development and State ownership of lands along the Corridor, Secretary Burgum also failed to adequately explain Interior's change in policy or provide a reasoned, detailed justification for his contrary factual findings.

139.    Defendants' failure to provide the required justification for their reversal in policy and changed factual findings was "arbitrary, capricious, . . . not in accordance with law," and without observance of the procedure required by ANILCA and the APA. 5 U.S.C. § 706(2).

### Count VI: Violation of NEPA

140.    Plaintiffs incorporate by reference all preceding paragraphs.

141.    Pursuant to NEPA, agencies must take a hard look at the consequences, environmental impacts, and adverse effects of their proposed actions, consider alternatives to the proposed action, and evaluate mitigation measures. 42 U.S.C. § 4332(2)(C).

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*N. Alaska Envt'l Ctr. v. Burgum*
Case No. 3:26-cv-00108                                                Page 48 of 50

142.    Federal agencies must prepare an EIS for any major federal action that may significantly affect the quality of the human environment. *Id.*

143.    Revoking PLOs 5150 and 5180, fully or partially, is a major federal action that may significantly affect the quality of the human environment.

144.    BLM failed to prepare either an EA or an EIS to support the Secretary's action to partially revoke PLOs 5150 and 5180. Further, BLM did not adequately evaluate changed circumstances and information that were relevant to environmental impacts.

145.    The Secretary's partial revocation of PLOs 5150 and 5180 without preparing an EIS or EA was "arbitrary, capricious, . . . not in accordance with law," and without observance of the procedure required by NEPA, its implementing regulations, and the APA. 5 U.S.C. § 706(2).

## **REQUEST FOR RELIEF**

Plaintiffs respectfully request that this Court grant the following relief:

1.    Declare that the Secretary's decision to partially revoke PLO 5150 and 5180 and Defendants' supporting analysis and implementing decisions violated ANCSA, ANILCA, FLPMA, NEPA, and the APA;

2.    Declare that the Secretary's decision to treat the State's topfiling of lands withdrawn under ANCSA section 17(c) as effective selections is unlawful;

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*N. Alaska Envt'l Ctr. v. Burgum*
Case No. 3:26-cv-00108                                      Page 49 of 50

Case 3:26-cv-00108-ACP    Document 1    Filed 03/10/26    Page 49 of 50

3. Declare that the actions set forth above are arbitrary, capricious, an abuse of discretion, not in accordance with law, and without observance of procedure required by law;

4. Permanently enjoin Defendants from conveying the lands withdrawn under ANCSA section 17(c) to the State;

5. Invalidate, vacate, and set aside PLO 7966 (the Secretary's revocation decision), the Secretary's Decision Rationale, BLM's DNA, Defendants' ANILCA section 810 findings, and any other supporting documents;

6. Issue an order reinstating PLO 5150 and PLO 5180;

7. Enter other appropriate declaratory and injunctive relief;

8. Award Plaintiffs all reasonable attorney fees and costs as authorized by law; and

9. Grant such other and further relief as this Court deems just and proper.


Respectfully submitted this 10th day of March, 2026,


   s/ Bridget Psarianos
Bridget Psarianos (AK Bar No. 1705025)
Suzanne Bostrom (AK Bar No. 1011068)
TRUSTEES FOR ALASKA

*Attorneys for Plaintiffs*


COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*N. Alaska Envt'l Ctr. v. Burgum*
Case No. 3:26-cv-00108

Case 3:26-cv-00108-ACP    Document 1    Filed 03/10/26    Page 50 of 50