Bridget Psarianos (AK Bar No. 1705025)
Suzanne Bostrom (AK Bar No. 1011068)
TRUSTEES FOR ALASKA
121 W. Fireweed Lane, Suite 105
Anchorage, AK 99503
Phone: (907) 276-4244
Fax: (907) 276-7110
bpsarianos@trustees.org
sbostrom@trustees.org

*Attorneys for Plaintiffs*

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| NORTHERN ALASKA ENVIRONMENTAL CENTER, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DOUG BURGUM, *et al.*,<br><br>Defendants. | Case No. 3:26-cv-00108-ACP |

### PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION
(Fed. R. Civ. P. 65)

Plaintiffs Northern Alaska Environmental Center *et al.* (collectively, Northern Center) request a temporary restraining order and preliminary injunction (TRO/PI) to prevent the U.S. Department of the Interior (Interior) and Bureau of Land Management (BLM) from taking further steps to convey the public lands at issue in this case until after the merits are resolved.

Pls.' Mot. for TRO & Prelim. Inj.
*N. Alaska Env't Ctr. v. Burgum*, Case No. 3:26-cv-00108-ACP                Page 1

Over fifty years ago, the Secretary of the Interior (Secretary) withdrew public lands encompassing the area surrounding what is now the Trans-Alaska Pipeline System (TAPS) and adjacent Dalton Highway (the Corridor) through Public Land Orders (PLOs) 5150 and 5180. The withdrawals in PLO 5150 are subject to a statutory prohibition against land selections by the State of Alaska (State) within the Corridor under Section 17(c) of the Alaska Native Claims Settlement Act (ANCSA). The prohibition in Section 17(c) reflected Congress's intention for these lands to remain in federal ownership for the duration of TAPS operation to provide stability and certainty for the activities within the Corridor and to protect environmental values. Together, the statutory prohibition and the withdrawals in PLOs 5150 and 5180 protected lands within the Corridor from mining, mineral leasing, and otherwise being conveyed out of federal ownership. Later provisions of the Alaska National Interest Lands Conservation Act (ANILCA) that allowed the State to "topfile"—*i.e.*, indicate an interest in obtaining future ownership—over these lands did not change that.

In February 2026, the Secretary partially revoked PLOs 5150 and 5180, lifting the withdrawals for over two million acres of public lands. Northern Center promptly challenged the withdrawal revocations because the Secretary's and BLM's actions violated numerous federal statutes.

On May 5, 2026, Interior nonetheless issued tentative approvals to begin the conveyance process for approximately 1.4 million acres within the Corridor to the State,

Pls.' Mot. for TRO & Prelim. Inj.
*N. Alaska Env't Ctr. v. Burgum*, Case No. 3:26-cv-00108-ACP                Page 2

and there is the potential for it to do the same for another 700,000 acres. The Secretary's issuance of tentative approvals is based on the erroneous legal theory that the State's topfilings became effective selections upon the revocation of the withdrawals. This directly contravenes the statutory prohibition in Section 17(c) and renders the Secretary's tentative approvals void ab initio.

On the day the Interior announced the tentative approvals, the State filed a motion to dismiss this litigation under the theory the Court cannot provide a remedy for Interior's violation of multiple federal laws due to the State's sovereign immunity. The State is incorrect, and Northern Center will respond to that motion separately.

For purposes of the present motion, the land conveyances are still incomplete, as the federal government has not yet issued patents to the State. Northern Center seeks to enjoin any further actions by Interior to finalize the transfer of these lands and improperly treat the State's topfilings as valid selections. Although Plaintiffs dispute the State's assertions that the tentative approvals and other actions divest the court of jurisdiction to review this case, Plaintiffs are filing this motion out of an abundance of caution to preserve Northern Center's equities and to prevent the potential for irreparable harm if Interior finalizes any land transfers to the State. Specifically, Northern Center seeks to enjoin Interior from: (1) finalizing any patents on lands that have been tentatively approved, and (2) issuing any tentative approvals or patents on the 700,000 acres of

Pls.' Mot. for TRO & Prelim. Inj.
*N. Alaska Env't Ctr. v. Burgum*, Case No. 3:26-cv-00108-ACP                Page 3

Case 3:26-cv-00108-ACP    Document 17    Filed 05/21/26    Page 3 of 24

Corridor lands that have yet to be tentatively approved.[1] Injunctive relief is necessary to prevent irreparable harm to public lands and subsistence resources, as well as Northern Center's members' interests, before the Court issues a decision on the merits.

BACKGROUND

In 1971, Congress enacted ANCSA, prompted by the discovery of oil on the North Slope and the proposal to build TAPS.[2] Specifically, the discovery of oil at Prudhoe Bay pushed Congress to settle land claims to allow unhindered construction of TAPS.[3] The Dalton Highway, built in the 1970s to support TAPS construction, stretches from Livengood to Prudhoe Bay. Shortly after ANCSA's enactment, the Secretary issued PLO 5150 pursuant to ANCSA Section 17(c) to withdraw the Corridor for the Dalton Highway and TAPS.[4] In 1972, the Secretary issued PLO 5180 pursuant to ANCSA Section 17(d)(1) over much of the same area, removing these lands from all forms of appropriation to protect the public interest.[5]

---

[1] While Courts generally have authority to revoke patents, *see e.g.*, *Muckleshoot Indian Tribe v. United States Forest Serv.*, 177 F.3d 800 (9th Cir. 1999), Northern Center is filing this motion ahead of patent issuance to the State to avoid further arguments regarding the State's interests and equites.

[2] *See Alyeska Pipeline Serv. Co. v. Kluti Kaah Native Vill. of Copper Ctr.*, 101 F.3d 610, 613 (9th Cir. 1996).

[3] *Id.*

[4] Public Land Order 5150, 36 Fed. Reg. 25410 (Dec. 31, 1971).

[5] Public Land Order 5180, 37 Fed. Reg. 5583 (Mar. 16, 1972). This motion focuses on a subset of Northern Center's claims and will not address PLO 5180 further. Northern Center waives no claims by not including them now.

Pls.' Mot. for TRO & Prelim. Inj.
*N. Alaska Env't Ctr. v. Burgum*, Case No. 3:26-cv-00108-ACP                    Page 4

The Corridor, which crosses the Yukon River and rugged Brooks Range, and its surrounding lands are profoundly important to Alaska's wildlife and people for numerous reasons beyond oil development and transportation. It provides habitat for fish, moose, caribou, Dall sheep, beaver, bears, gray wolves, muskoxen, birds, and more.[6] A number of rural communities along and close to the Corridor rely on the area's resources for subsistence use, their culture, and their traditional way of life.[7] For decades, ANILCA ensured these communities enjoyed federal subsistence protections along the Corridor, including harvest priority and access protections.[8] Because of its incredible scenic and wildlife values, and relatively easy access, the Corridor is also popular for a wide range of recreational uses, including tours, backcountry travel and hiking, camping, river trips, and dog mushing.[9]

Pursuant to the Alaska Statehood Act (Statehood Act), BLM to date has transferred nearly 100 million acres across Alaska to the State to fulfill its land entitlements. The State had previously topfiled roughly two million acres within the Corridor.[10] A "topfiling" is a "future selection" that would, "if otherwise valid," become an effective selection at a future date, *i.e.*, when the land becomes available .[11] For decades, BLM refused to recommend broadly lifting PLOs 5150 and 5180 to make lands

---

[6] Pls.' Ex. A at 2–3.
[7] *Id.* at 5–6.
[8] *See* Pls.' Ex. D at 4, 8.
[9] Pls.' Ex. A at 4.
[10] Pls.' Ex. D at 1.
[11] 43 U.S.C. § 1635(e).

Pls.' Mot. for TRO & Prelim. Inj.
*N. Alaska Env't Ctr. v. Burgum*, Case No. 3:26-cv-00108-ACP                    Page 5

within the Corridor available for State selection due to the significant adverse impacts on the environment and public interest that would result.[12] BLM most recently rejected such a proposal at the conclusion of its years-long Central Yukon Resource Management Plan process.[13]

Interior changed its long-held stance earlier this year. On February 20, 2026, the Secretary issued a "Decision Rationale" purporting to explain his decision to revoke PLOs 5150 and 5180.[14] The Secretary stated that revoking the withdrawals would open the Corridor to location and entry under the public land and mining laws, and would allow over two million acres of land to become valid State selections under ANILCA.[15] BLM did not undertake an environmental review process under the National Environmental Policy Act (NEPA) or conduct a full evaluation of subsistence impacts under ANILCA Section 810 for that decision.[16]

Northern Center filed this lawsuit on March 10, 2026, seeking declaratory and injunctive relief, including a declaratory judgment that the Secretary's treatment of the State's topfiled lands withdrawn under Section 17(c) as effective selections is unlawful.[17]

---

[12] *See, e.g.*, Pls.' Ex. B at 2–3.

[13] *Id*.

[14] Pls.' Ex. D; *see also* Public Land Order No. 7966, 91 Fed. Reg. 9293 (Feb. 25, 2026).

[15] Pls.' Ex. D at 1.

[16] Pls.' Ex. C; Pls.' Ex. D at 6–11.

[17] Compl. for Declaratory & Injunctive Relief at 49–50, ECF No. 1.

Pls.' Mot. for TRO & Prelim. Inj.
*N. Alaska Env't Ctr. v. Burgum*, Case No. 3:26-cv-00108-ACP                Page 6

Northern Center joined the State as a defendant for purposes of giving this Court the broadest range of options to effect relief.[18]

On May 5, 2026, BLM began to transfer lands along the Corridor and issued tentative approvals to convey title of approximately 1.4 million acres within the Corridor to the State.[19] The next day, the State filed a motion to dismiss this litigation under the theory that this Court can no longer grant Northern Center any effective relief due to the status of the land conveyances and the State's sovereign immunity.[20]

To Northern Center's knowledge, Interior has not yet conveyed patents to the State for the nearly 1.4 million acres of land covered by the tentative approvals; Interior cannot do so until the lands have been fully surveyed and other steps are completed.[21] As such, while the State may have equitable title to tentatively approved lands, Interior still retains legal title.[22] It further appears that Interior has not yet taken any steps to

---

[18] *Id*. ¶ 30.

[19] Pls.' Ex. F.

[20] State of Alaska's Mot. to Dismiss, ECF No. 12 [hereinafter State Mot.].

[21] *See* Alaska Statehood Act § 6(g), Pub. L. No. 85-508, 72 Stat. 339, 341–42 (1958) [hereinafter Statehood Act]. Although ANILCA Section 906(c)(1) states that a tentative approval "confirms that all right, title, and interest of the United States" passes to the State, this is boilerplate language commonly used in quitclaim deeds. *See* BRYAN A. GARNER, GARNER'S DICTIONARY OF LEGAL USAGE 788–89 (3d ed. 2011). It confirms the transfer of only whatever "right, title, and interest" the United States holds, including restrictions on such interests. *See City of Santa Monica v. United States*, 650 Fed App'x 326, 327–28 (9th Cir. 2016).

[22] *See* Pls.' Ex. F; State Mot. at 8. Under the Statehood Act, the State may only issue conditional approvals for activities prior to patent issuance. Statehood Act § 6(g).

Pls.' Mot. for TRO & Prelim. Inj.
*N. Alaska Env't Ctr. v. Burgum*, Case No. 3:26-cv-00108-ACP                    Page 7

tentatively approve the conveyance of the remaining roughly 700,000 acres within the Corridor.[23]

LEGAL STANDARDS

The standards for a temporary restraining order and preliminary injunction are essentially the same.[24] Plaintiffs must establish: (1) likely success on the merits; (2) likely irreparable harm without preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest.[25] A plaintiff can obtain a TRO/PI by showing "serious questions going to the merits and a hardship balance that tips sharply toward the plaintiff" as long as the other factors are met.[26] Serious questions are "substantial, difficult, and doubtful" and require "more deliberative investigation."[27] This is a lower bar than demonstrating likely success on the merits.[28] A matter of first impression is more likely to raise serious questions warranting the issuance of a TRO/PI.[29]

---

[23] Pls.' Ex. F; Pls.' Ex. E.

[24] *See, e.g.*, *Washington v. Trump*, 847 F.3d 1151, 1164 (9th Cir. 2017).

[25] *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

[26] *Ariz. Mining Reform Coal. v. U.S. Forest Serv.*, 170 F.4th 879, 891 (9th Cir. 2026).

[27] *Gilder v. PGA Tour, Inc.*, 936 F.2d 417, 422 (9th Cir. 1991) (quoting *Republic of Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988)).

[28] *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1190 (9th Cir. 2024).

[29] *Stiner v. Brookdale Senior Living, Inc.*, 383 F. Supp. 3d 949, 953–54 (N.D. Cal. 2019); *see, e.g.*, *In re Rosenthal*, No. 2:25-cv-00828-JNW, 2025 U.S. Dist. LEXIS 115605, at *3–4 (W.D. Wash. June 17, 2025); *Akima Intra-Data, LLC v. United States*, 120 Fed. Cl. 25, 28 (Fed. Cl. 2015).

Pls.' Mot. for TRO & Prelim. Inj.
*N. Alaska Env't Ctr. v. Burgum*, Case No. 3:26-cv-00108-ACP          Page 8

Case 3:26-cv-00108-ACP     Document 17     Filed 05/21/26     Page 8 of 24

Under the Administrative Procedure Act, courts "hold unlawful and set aside agency action, findings, and conclusions" if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory . . . authority, or limitations," or if adopted "without observance of procedure required by law."[30]

Statutory interpretation is a question of law,[31] and courts rely on fundamental canons of statutory construction.[32]

ARGUMENT

## I. NORTHERN CENTER IS LIKELY TO SUCCEED ON THE MERITS.[33]

Northern Center is likely to succeed on its claim that the Secretary violated ANCSA when revoking the withdrawals and deeming the State's topfilings valid selections. Even assuming for purposes of this motion that the Secretary lawfully revoked PLO 5150 (which is not the case), Section 17(c) expressly prohibits the Secretary from treating the State's topfilings of lands previously subject to that withdrawal as valid selections and transferring the land absent further congressional action.

When enacting ANCSA, Congress included specific provisions to clear the way for the pipeline's development and to maintain TAPS under federal jurisdiction so long as it is operational. Specifically, Section 17(c) provides:

---

[30] 5 U.S.C. § 706(2)(A), (C)–(D).
[31] *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394, 412–13 (2024).
[32] *Bottinelli v. Salazar*, 929 F.3d 1196, 1199 (9th Cir. 2019).
[33] By presenting a subset of claims, Northern Center does not waive any claims or allegations in the complaint.

Pls.' Mot. for TRO & Prelim. Inj.
*N. Alaska Env't Ctr. v. Burgum*, Case No. 3:26-cv-00108-ACP                Page 9

**(c) Prohibition against selection of lands from withdrawn area in event of withdrawal of utility and transportation corridor across public lands.** In the event that the Secretary withdraws a utility and transportation corridor across public lands in Alaska pursuant to his existing authority, the State, the Village Corporations and the Regional Corporations shall not be permitted to select lands from the area withdrawn.[34]

Congress did not withdraw the Corridor; rather, Congress left that decision to the Secretary to make under "existing authority."[35] Shortly after ANCSA's enactment, the Secretary did just that. In PLO 5150, the Secretary withdrew the Corridor and reserved the lands "as a utility and transportation corridor within the meaning of section 17(c) of [ANCSA]."[36]

The plain language of Section 17(c) indicates those lands, once withdrawn, were no longer available for selection.[37] Section 17(c) states that "in the event that" the Secretary withdraws lands "for a utility and transportation corridor," the State and other entities "shall not be permitted to select lands from the area withdrawn."[38] Congress's use of the phrase "in the event that" is synonymous with the conditional term "if."[39] This language indicates that, if the Secretary withdraws lands for the Corridor, those lands

---

[34] 43 U.S.C. § 1616(c).

[35] Congress did not define "withdrawal" in ANCSA, but it is generally defined as removing Federal lands from the operation of general land laws to maintain public values or reserve the area for a public purpose. 43 U.S.C. § 1702(j).

[36] *See* Public Land Order 5150, 36 Fed. Reg. 25410 (Dec. 31, 1971).

[37] *Supra* Legal Standards.

[38] 43 U.S.C. § 1616(c).

[39] *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 252 (2011) (Sotomayor, J., dissenting) (citing WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1124 (2002)).

Pls.' Mot. for TRO & Prelim. Inj.
*N. Alaska Env't Ctr. v. Burgum*, Case No. 3:26-cv-00108-ACP          Page 10

"shall" not be available for selection.[40] Courts considering conditional language such as "if" interpret it to mean that Congress intends to apply specific conditions, and "shall" is mandatory.[41] The statute's plain language thus imposes an unequivocal prohibition on land selections in that area once the Secretary withdrew them for the utility and transportation corridor. In other words, the provision operates in only one direction: once the Secretary withdrew lands for the Corridor, those lands were off limits for future selection unless and until Congress said otherwise.

The lifting of the withdrawal did not make those lands available for selection. Nothing in the plain language reflects that lifting the withdrawal would override Congress's stated intent to prohibit the selection of those lands. Interpreting Section 17(c) to allow the Secretary to treat the State's topfilings as effective selections after lifting the withdrawals would render Congress's clear "shall not be permitted" language meaningless.[42] The Secretary's withdrawal in PLO 5150 reserved federal lands for the Corridor and barred the State from making valid selections once that occurred.[43] Congress's strongly-worded, mandatory language indicates that, once the condition

---

[40] 43 U.S.C. § 1616(c).

[41] *See State Farm Fire & Cas. Co. v. United States ex rel. Rigsby*, 580 U.S. 26, 35–36 (2016); *Portland Adventist Med. Ctr. v. Thompson*, 399 F.3d 1091, 1098 (9th Cir. 2005).

[42] *Rubin v. Islamic Republic of Iran*, 583 U.S. 202, 215 (2018) (explaining Courts interpret statutes to give effect to all provisions and avoid rendering language inoperative or void).

[43] Statehood Act § 6 (allowing selection of "vacant, unappropriated and unreserved land"); 36 Fed. Reg. 25410; *supra* note 36 (defining withdrawal).

Pls.' Mot. for TRO & Prelim. Inj.
*N. Alaska Env't Ctr. v. Burgum*, Case No. 3:26-cv-00108-ACP                    Page 11

occurred (*i.e.*, the Secretary withdrew lands for the utility and transportation corridor), the lands could not thereafter be selected by the State. Interpreting this section as ensuring that the lands withdrawn for the Corridor would remain under federal jurisdiction—absent further congressional action—is consistent with the plain language and would avoid rendering the statutory prohibition a nullity.[44]

Other sections of ANCSA reinforce that Congress had a distinct goal to keep the Corridor in federal jurisdiction. For example, unlike Section 17(c), withdrawals made under Section 17(d)(1) have an express mechanism in the statute granting the Secretary the authority to lift those withdrawals, subject to certain requirements.[45] Importantly, that provision does not expressly prohibit selections of those lands.[46]

This interpretation is also supported by the legislative history, which indicates that Congress intended to maintain the Corridor under federal jurisdiction into the future:

> Establishment of the Corridor will insure that if any major transportation facility or facilities (pipelines, roads, railroads, etc.) are ever constructed across the now roadless area north of the Yukon River, they will remain under federal jurisdiction in all applicable federal laws and standards with respect to the protection of Fish and Wildlife and the environment will continue to apply to the construction and operation of any facility or facilities which may be established in the future. . . . The public interest requires that entry into this great wilderness be regulated and controlled and that the environmental abuses on the Nation's public lands—whether by commercial interests, careless recreationists, or others—be avoided. . . .

---

[44] *Supra* note 43.

[45] 43 U.S.C. § 1616(d)(1).

[46] *Id.*; *see Russello v. United States*, 464 U.S. 16, 23 (1983) (explaining Courts presume Congress acts intentionally when including or excluding disparate statutory language).

Maintaining federal jurisdiction over the Corridor will make the attainment of all of these objectives possible.[47]

Congress also explained that the Corridor's public purposes were incompatible with "private lands."[48] These statements indicate that Congress sought to retain the lands utilized for the Corridor under federal jurisdiction, regardless of whether the withdrawal remained in place. Reading the plain language and legislative history together demonstrates that Congress intended to provide an additional layer of protection and stability for the Corridor to ensure it would remain in federal ownership after its establishment.

Later enactments did not change Section 17(c)'s prohibition or allow for the selection of these lands.[49] When Congress enacted ANILCA in 1980, it clarified some of the administrative processes for land conveyances.[50] Relevant here, ANILCA allows the State to "topfile," *i.e.*, note its desire to select lands that were unavailable for conveyance, but which might become available at a later time.[51] However, Congress' decision to allow for topfilings did not override the prohibition in Section 17(c).[52]

---

[47] S. Rep. No. 92-405, at 70–71 (1971); *see also id.* at 164–65 (similar language).
[48] *Id.* at 70–71, 170.
[49] *Branch v. Smith*, 538 U.S. 254, 273 (2003) (explaining courts avoid interpretations that implicitly repeal prior statutes).
[50] *See generally* ANILCA Title IX.
[51] 43 U.S.C. § 1635(e).
[52] When enacting ANILCA, Congress confirmed that lands subject to PLO 5150 lands were still unavailable for selection and could only be topfiled. *Id.* § 1635(j)(1).

Pls.' Mot. for TRO & Prelim. Inj.
*N. Alaska Env't Ctr. v. Burgum*, Case No. 3:26-cv-00108-ACP          Page 13

Nor did the Secretary's revocation of PLO 5150. While nothing precluded the State from topfiling lands within the Corridor, there were at least two impediments preventing those topfilings from becoming effective selections: the statutory prohibition in Section 17(c) and the Secretary's withdrawal.[53] The revocation of PLO 5150 removed only the latter. The State's topfilings could not become effective selections absent further action by Congress authorizing the transfer of those lands out of federal jurisdiction because of Section 17(c). The Secretary's lifting of the withdrawal did not change that.

In sum, ANCSA Section 17(c) prohibited the State from validly selecting land within the Corridor after the Secretary withdrew that land under PLO 5150.[54] Absent further congressional action, Section 17(c)'s prohibition precludes the State's topfilings from becoming effective selections. The Secretary's revocation of PLO 5150 did not override this statutory prohibition. As a result, the Secretary unlawfully deemed the State's topfilings valid selections and improperly issued tentative approvals for the conveyance of those lands to the State.[55] Northern Center has demonstrated that it is likely to succeed on the merits and has, at a minimum, raised serious questions on this issue of first impression that should be given further consideration in full briefing on the merits.[56]

---

[53] 43 U.S.C. § 1616(c); *see also* 36 Fed. Reg. 25410.
[54] 43 U.S.C. § 1616(c).
[55] *Supra* note 32.
[56] *Supra* notes 26–28.

Pls.' Mot. for TRO & Prelim. Inj.
*N. Alaska Env't Ctr. v. Burgum*, Case No. 3:26-cv-00108-ACP                Page 14

## II.     NORTHERN CENTER WILL SUFFER IRREPARABLE HARM.

An injunction is necessary to preserve the status quo and prevent irreparable harm to Plaintiffs' members' use and enjoyment of the environment and subsistence resources while the Court decides this case. Plaintiffs are asking this Court to preserve the status quo by pausing Interior's process to finalize the land patents and precluding it from taking further steps to transfer additional lands out of federal ownership to the State.[57]

There would be irreparable harm in the absence of injunctive relief pausing further actions by Interior to convey the lands to the State or finalize any decisions. Courts have long held that injunctive relief is appropriate to avoid environmental degradation.[58] Courts have recognized irreparable harm to those who use and enjoy public lands when those lands are transferred out of federal ownership or protections are removed.[59]

As the Secretary acknowledged, once the patents are finalized, federal protections would no longer apply; activities such as mining, oil and gas, and more could be

---

[57] *See supra* p. 6 (discussing the status of Interior's process); State Mot. at 11.

[58] *See Env't Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 991 (9th Cir. 2020); *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011); *Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978, 995 (8th Cir. 2011).

[59] *Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 325 (D.C. Cir. 1987) (recognizing the lifting of land withdrawals and the potential disposal of public lands constitutes irreparable harm because such actions "can deprive . . . members of the use and enjoyment of the lands' resources altogether"); *cf. Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1177 (9th Cir. 2000) (finding harm related to a land exchange from the loss of public lands to those who use and enjoy them, and directing the lower court to enter a preliminary injunction).

Pls.' Mot. for TRO & Prelim. Inj.
*N. Alaska Env't Ctr. v. Burgum*, Case No. 3:26-cv-00108-ACP                    Page 15

permitted on these lands by the State; and access guarantees would be lost.[60] In addition, rural subsistence users are and will continue to suffer irreparable harm because of a loss of federal subsistence protections under ANILCA, including the harvest priority, access protections, and subsistence impact reviews.[61] There are no analogous protections and access guarantees for subsistence users under State law.[62] Absent injunctive relief, these harms would be exacerbated by the transfer of these protected federal lands to the State, where they could be opened to mineral leasing, industrial development, increased sport hunting, and other activities.

In its Motion to Dismiss, the State argues that its sovereign immunity bars Northern Center from challenging these decisions.[63] If under the State's theory the transfer of the lands to the State is permanent, such that the Court cannot unwind it, the harm to Plaintiffs from finalizing any transfers would be inherently irreparable. Maintaining the status quo and enjoining Interior from taking any further steps to convey lands in the Corridor to the State would best preserve the Court's ability to provide Northern Center effective relief.

---

[60] Pls.' Ex. D at 3 (stating that the transfer of lands to the state would open those lands to mineral development and surface resource impacts, and that conveyance to the State could impact the ability of the public, as well as subsistence users, to access public and private lands).

[61] *United States v. Alaska*, 608 F. Supp. 3d 802, 813 (D. Alaska 2022).

[62] *See United States v. Alaska*, 151 F.4th 1124, 1127, 1129 (9th Cir. 2025).

[63] State Mot. at 14.

Pls.' Mot. for TRO & Prelim. Inj.
*N. Alaska Env't Ctr. v. Burgum*, Case No. 3:26-cv-00108-ACP                Page 16

Plaintiffs have members who live in, visit, and use the Corridor and adjacent lands and who will be irreparably harmed by patent issuance and further tentative approvals to transfer these lands to the State.[64] Sean Busby lives in Wiseman and uses and depends on the lands within the Corridor for subsistence use and his way of life.[65] The lifting of PLO 5150 has already harmed and interfered with his ability to continue using and accessing these lands, and he could be irreparably harmed if these public lands are permanently transferred to the State via patent issuance.[66] Permanently transferring the lands to the State will fundamentally harm and change Mr. Busby's ability to continue accessing these lands for subsistence and other uses that are guaranteed under federal law.[67] It would end the subsistence priority he had over other competing non-subsistence users on these lands, harming his ability to obtain food and other resources.[68] Removing these lands from federal jurisdiction will also harm Mr. Busby because he will no longer have guaranteed access to those lands for purposes of his business.[69]

Jeffery Groenke also lives and works on lands within and adjacent to the Corridor.[70] Patent issuance and the transfer of the lands to the State will irreparably harm

---

[64] Because of these harms, Plaintiffs also have standing. *See Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 600 U.S. 181, 199 (2023) (stating organizational standing test).

[65] Pls.' Ex. 2 at ¶¶ 2, 4–6.

[66] *Id.* at ¶ 7.

[67] *Id.* at ¶¶ 6–8.

[68] *Id.* at ¶¶ 6–8, 10.

[69] *Id.* at ¶ 10.

[70] Pls.' Ex. 1 at ¶ 2.

Pls.' Mot. for TRO & Prelim. Inj.
*N. Alaska Env't Ctr. v. Burgum*, Case No. 3:26-cv-00108-ACP          Page 17

Mr. Groenke by opening the region to further development, permanently removing federal protections, and subjecting the Corridor to the State's wildlife management and hunting regime.[71] This will in turn lead to greater pressure on the wildlife populations Mr. Groenke uses and enjoys.[72]

A portion of the lands at issue also encompasses the corridor for the Ambler Road, and one of Interior's stated purposes for revoking the withdrawals is to advance that project.[73] Plaintiffs' members will be irreparably harmed by any attempts to advance the Ambler Road under State management and with fewer protections. For example, the lodge owned and operated by John Gaedeke and his family is located on a lake across from where the Ambler Road and multiple gravel mines would be located.[74] The Ambler Road would irreparably harm him by turning the area he uses and enjoys into an industrial corridor, which would deter clients, harm his business, and ruin his own desire to return to his family home.[75] Mr. Gaedeke also utilizes and traverses the lands along the Corridor, both for personal use and with clients.[76] Patent issuance to the State could, under the State's argument, permanently take away the federal access guarantees that Mr. Gaedeke relies on when using these lands.[77]

---

[71] *Id.* at ¶¶ 15–17, 20, 22.
[72] *Id.*
[73] Pls.' Ex. D at 3.
[74] Pls.' Ex. 3 at ¶¶ 10–11.
[75] *Id.* at ¶¶ 10–15, 18.
[76] *Id.* at ¶¶ 16–17.
[77] *Id.*

Pls.' Mot. for TRO & Prelim. Inj.
*N. Alaska Env't Ctr. v. Burgum*, Case No. 3:26-cv-00108-ACP                    Page 18

Heather Meader owns property on Wild Lake in the Brooks Range, where she grew up and returns to annually.[78] Ms. Meader regularly traverses and utilizes the areas formerly withdrawn by PLO 5150.[79] Under the State's theory, if these lands are patented and permanently transferred to the State, her ability to continue accessing and utilizing these areas will be irreparably harmed because they would no longer be subject to federal access guarantees.[80] Expanded industrialization that would be facilitated by the land transfer, including the Ambler Road and associated mining and development, would also irreparably harm her ability to continue using and enjoying these lands and wildlife that depend on them.[81]

In sum, Plaintiffs and their members will suffer irreparable harm in the absence of an injunction to prevent Interior from taking any further steps to finalize or convey lands to the State while the Court reviews this case.

## III. THE BALANCE OF EQUITIES AND PUBLIC INTEREST STRONGLY FAVOR AN INJUNCTION.

In cases against the government, the balance of equities and public interest factors merge.[82] In evaluating these factors, courts consider the impact to "each party of the granting or withholding of the requested relief."[83] A preliminary injunction serves to

---

[78] Pls.' Ex. 4 at ¶ 2, 4.
[79] *Id.* at ¶ 8–9.
[80] *Id.* at ¶ 9.
[81] *Id.* at ¶¶ 9, 13–15, 20–21.
[82] *Nken v. Holder*, 556 U.S. 418, 435 (2009).
[83] *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987).

Pls.' Mot. for TRO & Prelim. Inj.
*N. Alaska Env't Ctr. v. Burgum*, Case No. 3:26-cv-00108-ACP                Page 19

prevent irreparable harm "so as to preserve the court's ability to render a meaningful decision on the merits. It often happens that this purpose is furthered by the status quo."[84] There is a well-established "public interest in preserving nature and avoiding irreparable environmental injury."[85] Here, the balance of equities and public interest strongly favor preserving the status quo by preventing any patents from issuing on nearly 1.4 million acres and enjoining tentative approval and patents on approximately 700,000 acres of public lands.[86]

As explained above, after revoking PLO 5150, the Secretary unlawfully deemed the State's topfilings to have been converted into valid selections and took steps to transfer the lands to the State via the tentative approvals. Preserving the status quo by preventing further transfers to the State ensures that this Court is best positioned to grant effective relief.[87] This would further ensure that there are no competing land use decisions or land appropriations made by the State while the case is pending, which could cause confusion and potentially conflicting property interests. Preserving the status quo

---

[84] *Doe v. Trump*, 957 F.3d 1050, 1968 (9th Cir. 2020) (quoting *Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*, 512 F.3d 1112, 1116 (9th Cir. 2008)); *see also Chalk v. U.S. Dist. Court Cent. Dist. of Cal.*, 840 F.2d 701, 704 (9th Cir. 1988) (explaining a preliminary injunction preserves the status quo).

[85] *Lands Council v. McNair*, 537 F.3d 981, 1005 (9th Cir. 2008) (en banc).

[86] *See Nuiqsut Trilateral, Inc. v. Burgum*, No. 3:26-cv-00098-SLG, 2026 U.S. Dist. LEXIS 53246, at *24–25 (D. Alaska Mar. 16, 2026) (holding that the balance of equities and public interest favored preserving the status quo in a property rights dispute with Interior).

[87] *Cf. Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1187–88 (9th Cir. 2000) (recognizing court's ability to vacate property transaction to maintain status quo and entering a preliminary injunction to stop a land exchange).

Pls.' Mot. for TRO & Prelim. Inj.
*N. Alaska Env't Ctr. v. Burgum*, Case No. 3:26-cv-00108-ACP                    Page 20

Case 3:26-cv-00108-ACP     Document 17     Filed 05/21/26     Page 20 of 24

would also protect the environment, given that one of the main justifications for the land conveyance is to enable industrial activity in the region under State management.[88] Enjoining the Secretary from taking any further actions under the legally flawed premise that the State's topfilings along the Corridor have become valid selections ensures that the government follows the law, which is in the public interest.[89] This is particularly true where, as here, an injunction preserves management of public lands for multiple use while a case is resolved on the merits.[90]

Additionally, under the State's theory, if further tentative approvals occur, subsistence protections along the Corridor could be permanently diminished.[91] Protecting rural subsistence uses on these lands serves the public interest and is consistent with Congress's intent as provided in ANILCA.[92] Relatedly, injunctive relief helps to ensure that, given the State's arguments, federal lands are not potentially permanently removed from federal subsistence protections while this litigation is pending.[93]

---

[88] *See supra* note 60 and accompanying text; Statehood Act § 6(g) (only allowing the State to conditionally approve land dispositions prior to patent issuance).

[89] *Envtl. Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 992 (9th Cir. 2020).

[90] *See Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 326–27 (D.C. Cir. 1987).

[91] *See* 16 U.S.C. 3112(2).

[92] *United States v. Alaska*, 608 F. Supp. 3d 802, 813 (D. Alaska 2022); *see also supra* Argument Section II and notes 65–69 (discussing subsistence access and priority harms).

[93] *Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1177, 1188 (9th Cir. 2000) (recognizing interests of federal land users to protect those lands from disposition and ensure compliance with the law); *see also supra* Argument Section II (discussing members use and enjoyment of the Corridor and harms).

Pls.' Mot. for TRO & Prelim. Inj.
*N. Alaska Env't Ctr. v. Burgum*, Case No. 3:26-cv-00108-ACP                    Page 21

Any harm to the State from having to wait until the case is fully adjudicated before it could obtain patents or receive further tentative approvals is minimal, and the benefit to the State of obtaining these lands if they are successful would not be lost, only delayed.[94] Because the State received tentative approvals for a subset of lands roughly two weeks ago, it is unlikely that the State would be harmed by having issued any leases or made any other commitments that would be put at risk from an injunction. Additionally, to the extent that the State seeks to complete its entitlements under the Statehood Act sooner, the State has additional land selections available to do so.[95]

Additionally, this Court should decline to impose a bond under Federal Rule of Civil Procedure 65(c). Courts have considerable discretion in this regard,[96] and regularly do not require bonds in public interest environmental cases like this one.[97]

<u>CONCLUSION</u>

For the foregoing reasons, this Court should enjoin Interior from finalizing the land patents or taking further steps to transfer additional lands to the State while this case is pending.

---

[94] *See Apache Stronghold v. United States*, 782 F. Supp. 3d 756, 768–69 (D. Ariz. 2025); *cf. Nat'l Wildlife Fed'n*, 835 F.2d at 326 (upholding preliminary injunction and stating that delay of third parties' interests in mining claims and leases was minimal and outweighed by the loss of the use and enjoyment of the federal lands).

[95] *See* State Mot. at 4, note 15.

[96] *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999); *Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1325–26 (9th Cir. 1985).

[97] *See, e.g.*, *All. for the Wild Rockies v. Gassmann*, 604 F. Supp. 3d 1022, 1037 (D. Mont. 2022); *W. Watersheds Project v. Schneider*, 417 F. Supp. 3d 1319, 1335 (D. Idaho 2019); *Cent. Or. Landwatch v. Connaughton*, 905 F. Supp. 2d 1192, 1198 (D. Or. 2012).

Pls.' Mot. for TRO & Prelim. Inj.
*N. Alaska Env't Ctr. v. Burgum*, Case No. 3:26-cv-00108-ACP                    Page 22

Case 3:26-cv-00108-ACP   Document 17   Filed 05/21/26   Page 22 of 24

Respectfully submitted this 21st day of May, 2026.

 s/ Bridget Psarianos
Bridget Psarianos (AK Bar No. 1705025)
Suzanne Bostrom (AK Bar No. 1011068)
TRUSTEES FOR ALASKA

Attorneys for Plaintiffs

Pls.' Mot. for TRO & Prelim. Inj.
*N. Alaska Env't Ctr. v. Burgum*, Case No. 3:26-cv-00108-ACP          Page 23

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rule 7.4(a)(3), I certify that this motion complies with the type-volume limitation of 7.4(a)(1) and contains 5,645 words, excluding the parts exempted by Local Civil Rule 7.4(a)(4).

s/Bridget Psarianos
Bridget Psarianos

## CERTIFICATE OF SERVICE

I certify that on May 21, 2026, I caused a copy of PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION to be electronically filed with the Clerk of the Court for the U.S. District Court of Alaska using the CM/ECF system which will send electronic notification of such filings to the attorneys of record in this case.

s/Bridget Psarianos
Bridget Psarianos

Case 3:26-cv-00108-ACP    Document 17    Filed 05/21/26    Page 24 of 24