# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF ALASKA

NORTHERN ALASKA
ENVIRONMENTAL CENTER, *et al.*,

      Plaintiffs,

      v.

DOUG BURGUM, in his official capacity
as Secretary of the Interior, *et al.*,

      Defendants,

    and

STATE OF ALASKA,

      Defendant.

3:26-cv-00108-ACP

**OMNIBUS ORDER**
[Dkt. 12, 17]

Nearly seventy years ago, Congress promised Alaska that if it joined the Union, it would receive 103 million acres of land to "propel private industry and create a tax base." *Sturgeon v. Frost*, 587 U.S. 28, 34 (2019) (*Sturgeon II*). That promise has not been fulfilled. Earlier this year, however, the Department of Interior revoked public land orders 5150 and 5180, removing an obstacle to the transfer of nearly 2 million acres Alaska selected decades ago.

In response, several environmental groups, referred to collectively as "Northern Center," filed this action seeking to halt the transfer process. Alaska moved to dismiss on sovereign immunity grounds, a position Interior joins. Northern Center opposed dismissal and moved for a preliminary injunction to prevent further progress toward conveyance.

The motions present two distinct questions. The first is whether Alaska's sovereign immunity bars this action. The second is whether Northern Center has satisfied the demanding standard for preliminary relief. Alaska's motion to dismiss is **GRANTED** in part. Sovereign immunity bars claims that would disturb Alaska's vested interest in lands already tentatively approved for transfer, but it does not require dismissal as to lands that have not yet reached that stage of the transfer process. Northern Center's motion for a preliminary injunction is **DENIED** as to the remaining lands because it has not demonstrated a likelihood of success on the merits of the only legal claim discussed in the motion, nor has it shown that irreparable harm is imminent.

## I.     LEGAL BACKGROUND

Three statutes frame this dispute: the Alaska Statehood Act, the Alaska Native Claims Settlement Act, and the Alaska National Interest Lands Conservation Act. Together, they established the terms upon which Alaska entered the Union and the framework governing the selection and conveyance of its lands. Yet, as this case demonstrates, the process remains unfinished nearly seven decades later.

When Congress passed the Alaska Statehood Act in 1958, it promised to transfer vast amounts of land into state ownership. Pub. L. No. 85-508, 72 Stat. 339 (1958); *Metlakatla Indian Cmty. v. Dunleavy*, 58 F.4th 1034, 1041 (9th Cir. 2023). To facilitate that process, the law authorized Alaska to select approximately 103 million acres of "vacant, unappropriated, and unreserved" lands for state ownership. Alaska Statehood Act § 6(a), 72 Stat. 340. The State's selections had to be completed within a prescribed period, although Congress later extended that deadline. *See Id.*; Pub. L. 96-487 § 906(a), 94 Stat.

2437. Selected lands also had to be surveyed before final patents could issue. Alaska Statehood Act, § 6(g), 72 Stat. 342.

The Statehood Act also brought disputes over Alaksa Native aboriginal title to the forefront. As the Supreme Court has explained, it "provoked land claims from Alaska Natives" based on aboriginal title. *Sturgeon II*, 587 U.S. at 35. The discovery of oil on the North Slope, and the need to construct the Trans-Alaska Pipeline across lands subject to those claims, added urgency to resolving the dispute. *Id.* To reconcile these interests, Congress passed the Alaska Native Claims Settlement Act (ANCSA) in 1971, which "extinguished the Natives' aboriginal claims." *Id.*; 43 U.S.C. §§ 1603(a)-(c). In exchange, the law mandated the creation of for-profit Alaska Native corporations and allowed them to select and receive federal lands for the benefit of their shareholders. 43 U.S.C. §§ 1606, 1607.

ANCSA also addressed the withdrawal of public lands in Alaska. Upon its enactment, all unreserved lands in Alaska were withdrawn from the public domain for ninety days while the Secretary of the Interior determined whether any "should be withdrawn under authority provided for in existing law to insure that the public interest in these lands is properly protected." 43 U.S.C. § 1616(d)(1).

A related provision of ANCSA is central to this dispute. Section 17(c) imposes restrictions on lands that the Secretary has withdrawn for utility and transportation corridors:

> **Prohibition against selection of lands from withdrawn area
> in even of withdrawal of utility and transportation corridor
> across public lands.** In the event that the Secretary withdraws

> a utility and transportation corridor across public lands in Alaska pursuant to his existing authority, the State, the Village Corporations, and the Regional Corporations shall not be permitted to select lands from the area withdrawn.

*Id.* § 1616(c). This prohibited Alaska from selecting lands for ownership while the land was withdrawn for a qualifying purpose.

The final statute at issue here is the Alaska National Interest Lands Conservation Act (ANILCA). Pub. L. No. 96-487, 94 Stat. 2371 (primarily codified as scattered sections of 16 U.S.C. and 43 U.S.C.). Enacted nearly a decade after ANCSA, ANILCA pursued two primary objectives. Congress sought to protect "the national interest in the scenic, natural, cultural and environmental values on the public lands in Alaska." 16 U.S.C. § 3101(d). At the same time, and equally important, it sought to provide "adequate opportunity for satisfaction of the economic and social needs of the State of Alaska and its people." *Id.* Neither goal was entirely subordinate to the other. ANILCA instead reflects an effort to accommodate both. ANILCA also modified the process by which Alaska could select and take ownership of Statehood Act lands. For example, it extended the deadline for Alaska to select lands and required the State to prioritize selections. Pub. L. 96-487, § 906(a), 94 Stat. 2473.

More importantly for present purposes, ANILCA created the "topfiling" system. The system allowed Alaska to identify lands it wished to receive even though they were not yet available for selection. As relevant here, that included lands subject to existing withdrawals. 43 U.S.C. § 1635(e). The relevant provision says:

> [T]he State, at its option, may file future selection applications . . . pursuant to section 6(a) or (b) of the Alaska

Statehood Act or subsection (b) of this section, for lands which are not, on the date of filing of such applications, available within the meaning of section 6(a) or (b) of the Alaska Statehood Act, other than lands within any conservation system unit or the National Petroleum Reserve—Alaska. Each such selection application, if otherwise valid, shall become an effective selection without further action by the State upon the date the lands included in such application become available . . . .

*Id.* The significance of a topfiling is that no additional application is required. Once the previously unavailable land becomes available, the topfiling automatically ripens into an effective selection by operation of law. When that occurs, the selected lands are immediately segregated from other federal lands. 43 C.F.R. § 2627.4(b).

Selection does not immediately transfer ownership, however. Title vests later, when Interior tentatively approves the conveyance. At that point, "all right, title, and interest of the United States . . . is deemed to have vested in the State of Alaska as of the date of tentative approval." 43 U.S.C. § 1635(c)(1).

## II.     FACTUAL BACKGROUND

In the 1970s, the Secretary of the Interior withdrew federal lands along what are now the Dalton Highway and the Trans-Alaska Pipeline corridor under applicable public land laws. Public Land Orders 5150 and 5180 established those withdrawals. 36 Fed. Reg. 25410 (Dec. 31, 1971) (PLO 5150); 37 Fed. Reg. 5583 (Mar. 16, 1972) (PLO 5180). Those withdrawals encompassed lands Alaska otherwise would have been entitled to select under

the Statehood Act. But Section 17(c) of ANCSA prohibited the State from selecting lands within the withdrawal corridor while the withdrawal remained in effect.

Following ANILCA, Alaska submitted topfiling applications for many of the withdrawn lands pursuant to 43 U.S.C. § 1635(e). In doing so, Alaska preserved its position: if the withdrawals were lifted, Alaska anticipated that the topfilings would ripen into effective selections. But the withdrawals remained in place, delaying conveyance of those lands for years.

That changed in February 2026.

The Secretary of the Interior issued Public Land Order 7966, which revoked PLOs 5150 and 5180 as to approximately 2.1 million acres along the corridor. 91 Fed. Reg. 9293, 9293-94 (Feb. 25, 2026). The revocation became effective on March 27, 2026. *Id.* at 9295. On April 21, 2026, Interior concluded that Alaska's topfilings had ripened into effective selections as of the revocation's effective date. (Dkt. 12-1 at 4) Interior then issued tentative approval for approximately 1.38 million acres on May 5, 2026. (Dkt. 12-2 at 29) The remaining approximately 700,000 acres have not been tentatively approved. According to a declaration from the BLM's Alaska State Director, no patent or further tentative approval on those remaining acres will be completed in the next "several months"; BLM will take no further action absent an additional request from Alaska. (Dkt. 25-1)

Northern Center filed this action to challenge the revocation and the resulting transfer process. The complaint asserts claims under ANCSA, ANILCA, NEPA, FLPMA, and the APA. Alaska has moved to dismiss on Eleventh Amendment grounds; Interior does

not oppose that motion. Northern Center has moved for a preliminary injunction to halt further steps in the transfer process pending resolution of the case.

Although the complaint advances several legal theories, the preliminary injunction motion rests on only one. Norther Center contends that §17(c) of ANCSA prohibits Alaska's topfilings from ripening into effective selections absent a further Act of Congress. Briefing on both motions is complete.

### III.   ANALYSIS

The federal government has unfinished obligations under the Alaska Statehood Act. It must transfer more land into state ownership. Congress established the process governing those transfers through ANCSA and ANILCA. Alaska identifies lands that it wants, and the federal government determines whether those lands are available for selection and conveyance. This case presents three main questions.

(1) The Executive Branch revoked the withdrawal orders that had made lands in the Dalton Highway Corridor unavailable to Alaska. Were those revocations lawful?

(2) Once the lands were available, did Alaska's topfilings ripen into effective selections under the statutory framework Congress enacted, or does the transfer require further Congressional action?

(3) Given Alaska's present interest in the lands at issue, is this lawsuit barred by sovereign immunity?

This decision reaches only the second and third questions, starting with the third because sovereign immunity is a threshold issue.[1]

---

[1] The first question—whether the withdrawal revocations were lawful—is not at issue here because it was not raised in Alaska's motion to dismiss or Northern Center's motion for a preliminary injunction. That question is reserved until it is briefed.

**A.    The State's motion to dismiss is granted only with respect to lands that have been tentatively approved for transfer.**

Sovereign immunity bars private parties from suing states in federal court. Alaska therefore is immune from this suit. The parties disagree about the consequences of that reality. Alaska argues that the entire case must be dismissed because the State has a vested property interest in all the lands at issue, and federal courts lack jurisdiction over cases to divest that interest. As Justice O'Connor explained: "A federal court cannot summon a State before it in a private action seeking to divest the State of a property interest." *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 289 (1997) (O'Connor, J., concurring in part). Interior agrees with Alaska. (Dkt. 20)

Northern Center responds that the entire case may proceed against Interior without Alaska. In its view this case will not divest Alaska of a property interest because, whatever interest Alaska presently possesses, the United States still holds legal title to the lands. Northern Center further argues that, if necessary, relief could be fashioned by ordering Interior to sue Alaska to recover title to unlawfully conveyed lands.

Both parties are right and wrong. Tentative approval is key to understanding why.

ANILCA provides that "all right, title, and interest of the United States . . . is deemed to have vested in the State of Alaska as of the date of tentative approval." 43 U.S.C. § 1635(c)(1). So once lands are tentatively approved, Alaska holds "all right, title, and interest" to them. At that point, although nominally directed at Interior, the suit seeks relief that would operate directly against Alaska's vested property interest. Granting relief involving tentatively approved lands, even if directed at Interior, would divest Alaska of

the very property interest Congress declared to have vested in the State. *Coeur d'Alene* does not permit a private plaintiff to obtain that relief, whether the named defendant is the State or the federal government.

But ANILCA's clarity cuts both ways.

Before tentative approval, Alaska does not hold "all right, title, and interest" in the land. It has something less: an effective selection. That is a meaningful interest. But it is not full title. As to those lands, Northern Center does not seek to *divest* Alaska of an existing property interest, it seeks to prevent that interest from further *vesting*. That distinction changes the Eleventh Amendment analysis. Rule 19 could still require these claims to be dismissed on equitable grounds, but as explained below it does not. Accordingly, this action may not proceed as to tentatively approved lands, but it may proceed as to non-tentatively approved lands. The following discussion therefore begins by analyzing the Eleventh Amendment and explaining why it bars Northern Center's Claims as to the tentatively approved lands.

1. **The Eleventh Amendment bars this case as to tentatively approved lands.**

Under the Eleventh Amendment:

> The Judicial power of the United States shall not be construed
> to extend to any suit in law or equity, commenced or prosecuted
> against one of the United States by Citizens of another State,
> or by Citizens or Subjects of any Foreign State.

This was a direct response to *Chisholm v. Georgia*, where the Supreme Court permitted a citizen of South Carolina to sue Georgia in federal court. *See* 2 U.S. 419 (1793). That case sparked immediate controversy because it confirmed something that many opponents of

ratification feared: Article III jurisdiction over controversies "between a State and Citizens of another State" allowed private parties to sue non-consenting states in federal court.

That fear was not new. Alexander Hamilton addressed it in The Federalist No. 81, arguing that it was "inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent," and that nothing in the proposed Constitution surrendered that immunity. The Federalist No. 81 (A. Hamilton) (emphasis omitted). Justice Iredell advanced a similar position in his dissent from *Chisholm*, reasoning that federal courts lacked authority to entertain common-law actions against states absent statutory authorization. *Chisholm*, 2 U.S. at 449-50 (Iredell, J., dissenting). The Eleventh Amendment followed shortly after *Chisholm* as a direct rebuke of the Judiciary's early approach to Article III.

The Amendment codified the states' understanding of their own immunity even though its text can be read more narrowly. For example, in *Hans v. Louisiana* the Supreme Court departed from the strictest reading of the text to hold that a state's own citizen could not sue the state in federal court. 134 U.S. 1 (1890). The Court reasoned that it would be anomalous to read the Amendment to bar suits by citizens of other states while allowing the same suit by a state's own citizens. *Id*. at 15. Since *Hans*, sovereign immunity has repeatedly been described as a doctrine grounded not only in the Eleventh Amendment's text, but also in "the Constitution's structure, its history, and the authoritative interpretations by this Court." *Alden v. Maine*, 527 U.S. 706, 713 (1999); *see also Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996). Similarly, the Supreme Court has "understood the Eleventh Amendment to confirm the structural understanding that States

entered the Union with their sovereign immunity intact, unlimited by Article III's jurisdictional grant." *Virginia Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 253 (2011).

There is substantial scholarly debate over whether *Hans* correctly captured the original meaning of the Eleventh Amendment. Some scholars have argued that the Amendment is best understood as a narrow response to *Chisholm* and as a limit on diversity-like, party-based jurisdiction, not as a broad constitutional immunity from federal-question suits. *See, e.g.*, William A. Fletcher, A Historical Interpretation of the Eleventh Amendment, 35 Stan. L. Rev. 1033, 1034-35 (1983). Other scholars have argued that the Amendment reflected a background principle of state sovereign immunity that survived the Constitution unless surrendered. *See, e.g.*, Caleb Nelson, Sovereign Immunity as a Doctrine of Personal Jurisdiction, 115 Harv. L. Rev. 1559, 1565-70 (2002). But whatever the force of that debate, the Supreme Court's interpretation of the Amendment governs. And under that doctrine, a state may not be sued in federal court by a private party unless the state waives immunity or Congress has validly abrogated it. *See Alden*, 527 U.S. at 713; *Seminole Tribe*, 517 U.S. at 55.

Alaska's immunity has not been waived or abrogated, so this case turns on the scope of that immunity. (Dkt. 12 at 12-14) The only thing Northern Center relies on is the APA's immunity waiver, but that does not apply to states. *See* 5 U.S.C. § 702. The question, therefore, is not whether Alaska has immunity. It does. The question is whether that immunity bars this case from proceeding against not only Alaska, but also Interior, and if so, as to which of the lands at issue.

The most relevant Supreme Court decision is *Idaho v. Coeur d'Alene Tribe of Idaho*. 521 U.S. 261 (1997). There, the Tribe sued Idaho officials seeking relief to establish that the Tribe, not the State, owned submerged lands under Lake Coeur d'Alene. *Id*. at 264-65. Although the Tribe tried to proceed under *Ex parte Young*, the suit was barred because it was the functional equivalent of a quiet title action against the State. *Id*. at 281-82, 287-88. And the submerged lands at issue "implicate[d] special sovereignty interests." *Id.* at 281-82. When these conditions are met, the Eleventh Amendment bars the entire suit.

The Ninth Circuit applied *Coeur d'Alene* in *Lacano Investments, LLC v. Balash*. 765 F.3d 1068 (9th Cir. 2014). There, the plaintiffs claimed ownership of Alaska streambeds and sued State officials for concluding that the State owned the same submerged land. *Id*. at 1070. The Ninth Circuit held that the suit was barred by sovereign immunity because it involved "precisely the same sovereignty interests as in *Coeur d'Alene* itself." *Id*. at 1073. The court rejected the argument that a party can evade sovereign immunity by pleading that a state does not lawfully own the lands at issue. *Id*. at 1074-5. Rather, it focused on whether the requested relief was the functional equivalent of a quiet title action. *Id*. at 1075-76. As explained below, much of this case falls within the ambit of *Coeur d'Alene* and *Lacano*.

### a. Alaska's interest in Statehood Act lands implicates special sovereign interests.

*Coeur d'Alene* applies to cases that "implicate[] special sovereignty interests." 521 U.S. at 284. That case dealt with navigable waters, which "uniquely implicate sovereign interests [under] ancient doctrines." *Id.* American law "adopted as its own much of" these

doctrines, including "the principle that submerged lands are held for a public purpose." *Id.* These developments were "a natural outgrowth of the perceived public character of submerged lands, a perception which underlies and informs the principle that these lands are tied in a unique way to sovereignty." *Id.* at 286. And they explain why submerged lands touch on "special sovereignty interests."

A State's territorial land does too. Indeed, it is bound up with sovereignty in the most basic sense: A sovereign is defined by the territory over which it exercises authority. *See e.g.*, *Pennoyer v. Neff*, 95 U.S. 714, 722-23 (1878) (detailing how sovereignty is tied to territoriality). And Alaska's Statehood Act was the mechanism by which the State obtained an initial land base to constitute itself as a sovereign State. These territorial lands may bear a different relationship to sovereignty than submerged lands. But the relationship is no less fundamental.[2]

Consider the text of the Statehood Act. The Statehood Act establishes itself as a "compact with the United States said State and its people"—it is not an ordinary land disposal statute. Alaska Statehood Act, § 4, 72 Stat. 399. As consideration for ceding aspects of its sovereignty to the federal government, Alaska was promised land in return. That land had a concrete, public purpose: "to propel private industry and create a tax base." *Sturgeon II*, 587 U.S. at 34. "Absent [this] land grant from the Federal Government to the State, there would be little land available to drive private economic activity and contribute

---

[2] The question presented here is whether the Eleventh Amendment analysis from *Coeur d'Alene* extends to Statehood Act Lands, not all land held by a State. This holding is therefore limited to lands selected under the Statehood Act.

to the state tax base." *Sturgeon v. Frost*, 577 U.S. 424, 429 (2016) (*Sturgeon I*). That is a main reason why Alaska joined the Union in the first place, to acquire this land and assert itself as a sovereign. *See Trustees for Alaska v. Alaska*, 736 P.2d 324, 335-36 (Alaska 1987). Statehood Act lands thus "implicate[s] special sovereignty interests" under *Coeur d'Alene*, and this case may not proceed if it is the functional equivalent of a quiet title action.

### b. For tentatively approved lands, this case is the functional equivalent of a quiet title action.

The next inquiry under *Coeur d'Alene* is whether this case is the functional equivalent of a quiet title action. The answer is yes, but only as to tentatively approved lands. A quiet title action, in its traditional form, is a suit to establish ownership of real property by resolving competing claims. *See Action*, Black's Law Dictionary (12th Ed. 2024). But the Eleventh Amendment concerns dealt with in *Coeur d'Alene* are not limited to suits with that precise form. *Coeur d'Alene* held that immunity extends to suits that are the "functional equivalent" of a quite title action—that is, suits in which the relief sought, if granted, would divest a state of a sovereign property interest. 521 U.S. at 282. The inquiry looks to the practical effect of the requested relief, not the pleading label. If a state holds a vested property interest covered by *Coeur d'Alene*, a court may not issue a decree divesting that interest.

Congress decided that tentative approval is the precise moment when Alaska's interest in Statehood Act land becomes fully vested. ANILCA provides that "*all* right, title, and interest of the United States in and to such lands is deemed to have vested in the State of Alaska as of the date of tentative approval." 43 U.S.C. § 1635(c)(1), (emphasis added).

Thus, after the moment of tentative approval, a decree unwinding that decision would "divest the State of a property interest." *Coeur d'Alene*, 521 U.S. at 289 (O'Connor, J., concurring in part). When that type of relief is requested, federal courts lack jurisdiction.

Northern Center's two counterarguments are not persuasive. First, it argues that patents have not been issued for tentatively approved lands, so the federal government (not Alaska) is the true landowner. (Dkt. 17 at 7; Dkt. 21 at 6-7) But that argument conflates legal title with the property interest at issue and misses the relevant inquiry. The question is whether this case is the functional equivalent of a quiet title action. And under ANILCA, it is for tentatively approved lands. That status is not merely an expression of the federal government's future intent. It vests all right, title, and interest in Alaska—full stop. 43 U.S.C. § 1635(c)(1). The fact that Interior has (limited) work to do before issuing patents does not change the analysis. *Id.* §§ 1635(c)(2)-(3).

Second, Northern Center cannot escape *Coeur d'Alene* by focusing on the *form* of relief because that case establishes a *functional* test. This move rests on a line of cases suggesting that perhaps the Court issue an order directing Interior to sue Alaska to recover tentatively approved lands. For example, in *Harrison v. Hickel* (pre-*Coeur d'Alene*), the Ninth Circuit held that sovereign immunity barred claims directly against Alaska, but it considered the possibility that the plaintiffs could sue the United States to compel Interior to sue the State. 6 F.3d 1347, 1353-54 (9th Cir. 1993). In *Aguilar v. United States* (pre-*Coeur d'Alene*), this Court held that Interior acted unlawfully when it conveyed land to the State without adequately addressing Native allotment claims, and it remanded to Interior, noting that if Interior had wrongfully conveyed land to the State, Interior had responsibility

to recover it. 474 F. Supp. 840, 847 (D. Alaska 1979). And in *Lord v. Babbitt* (pre-*Coeur d'Alene*), this Court held that the State was not a required party to an action against Interior concerning an allegedly wrongful conveyance because the issues between the plaintiff and the federal government could be adjudicated without the State. 943 F. Supp. 1203, 1210-11 (D. Alaska 1996).

These cases are not dispositive because none of them engage with *Coeur d'Alene*. In fact, all of them pre-date *Coeur d'Alene*. And Northern Center's use of these cases is incompatible with *Coeur d'Alene*'s functional test. For example, one proposal is that the Court could order Interior to sue Alaska to regain lands the federal government no longer has title to. (Dkt. 21 at 11, 13-14) But a private party may not launder its lawsuit through two branches of the federal government to evade the Eleventh Amendment. That is functionally, if not formally, a quiet title action.[3] Therefore, there is not federal jurisdiction over Northern Center's claims dealing with tentatively approved lands.

The outcome under *Coeur d'Alene* is different for lands that have not yet been tentatively approved. Alaska argues that its topfilings became effective on March 27, 2026, and all topfiled lands were then segregated from the public domain. (Dkt. 12 at 7-8; Dkt. 23 at 2) This, according to Alaska, gives it "presumptive title" and triggers *Coeur d'Alene*. (Dkt. 12 at 11-12) But ANILCA specifies exactly when Alaska's property right vests fully:

---

[3] The Eleventh Amendment might not bar Interior from suing Alaska to recover lands. *See United States v. Mississippi*, 380 U.S. 128, 140-41 (1965). But it bars private parties from initiating relief that would divest a state of a property interest covered by *Coeur d'Alene*.

at tentative approval and not before. Effective selections and segregation are meaningful, but they are fundamentally different from holding title to land.[4]

Accordingly, Alaska's sovereign immunity bars Northern Center's claims as to tentatively approved lands. For those, the suit is analogous to *Coeur d'Alene* because it is the functional equivalent of a quiet title action against Alaska, over which the Court lacks jurisdiction.[5] But the Eleventh Amendment does not resolve this case as to the remaining lands.

### 2. Civil Rule 19 permits this case to proceed as to the non-tentatively approved lands.

There is federal jurisdiction over the claims involving lands that have not been tentatively approved. Alaska nevertheless argues that Civil Rule 19 requires dismissal. Resolving that question involves three steps. First, the Court asks whether a party is required. *See* Fed. R. Civ. P. 19(a). Next, it asks whether the required party can be joined. *Id.* And finally, if joinder is not feasible, the Court asks whether the case may proceed "in equity and good conscience" absent the required party. *Id.* § (b).

---

[4] This does not mean the State has *no* interest in selected lands before tentative approval. Effective selections may have legal significance. For example, that status may segregate lands from other forms of appropriation, restrict some federal management actions, and place the lands in the queue for conveyance. *See* 43 U.S.C. § 1635(k)(1); 43 C.F.R. § 2627.4(b). But for Eleventh Amendment purposes, the question is whether Plaintiffs seek relief that would divest the State of a vested property interest. Under ANILCA, that situation arises after tentative approval and no sooner.

[5] This deprives the Court of jurisdiction over these claims independent of Civil Rule 19. *See Calderon v. Ashmus*, 523 U.S. 740, 745 n.2 (1998) ("[T]he Eleventh Amendment is jurisdictional . . . .").

The first two steps are not meaningfully disputed. Alaska argues that it is a required party that cannot be joined due to sovereign immunity; Interior agrees. (Dkt. 12, 20) Northern Center's argument starts with the assumption "that sovereign immunity precludes joinder of the State." (Dkt. 21 at 9) The parties disagree about the consequence of this fact.

This disagreement turns on Rule 19(b). The Rule directs courts to determine "whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." Fed. R. Civ. P. 19(b). In making this determination, courts consider four non-exhaustive factors (1) prejudice to the absent party or the existing parties, (2) whether prejudice and be avoided, (3) the adequacy of a judgment without the required party, and (4) whether the plaintiff would have an adequate remedy if the action were dismissed. *Id.* The Ninth Circuit has also recognized a "public rights exception" for when litigation seeks to vindicate a public interest against federal agency action. *See Conner v. Burford*, 848 F.2d 1441, 1459-60 (9th Cir. 1988); *Kescoli v. Babbitt*, 101 F.3d 1304, 1311 (9th Cir. 1996).

Those factors favor allowing the case to proceed as to lands that have not been tentatively approved.

First, the prejudice will be limited. As to Alaska, any judgment would address only the legality of Interior's authority to transfer lands in which the State's property right has not fully vested. Alaska's underlying selection rights, royalty entitlement, and statutory consultation rights would remain in place regardless of the outcome. And the other parties would not be prejudiced by a judgment rendered in Alaska's absence for similar reasons. Neither existing party needs Alaska to advance its case.

Second, any remaining prejudice can largely be avoided through carefully tailored relief. An injunction directed only at Interior's future actions regarding non-tentatively approved lands can mitigate whatever prejudice might exist.

Third, a judgement against Interior would also be adequate. Interior is the actor whose conduct is challenged, and Interior alone controls whether to issue tentative approval on the remaining acres.

Finally, dismissal may leave Northern Center without a meaningful forum to adjudicate their claims. That concern carries particular weight here because this litigation principally challenges federal agency action dealing with the public at large.

Accordingly, Rule 19 does not require dismissal of claims involving lands that have not been tentatively approved.

## B. Northern Center's request for a preliminary injunction is denied.

Northern Center moves for a preliminary injunction to prevent Interior from continuing the transfer process while this litigation proceeds. (Dkt. 17) The parties' briefing generally treats the disputed lands as a single category. As explained above, however, they are not. Because sovereign immunity bars claims involving lands that have already been tentatively approved, the preliminary injunction analysis applies only to lands that have not yet reached that stage.

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 24 (2008). To obtain one, a party must prove that (1) they are likely to succeed on the merits, (2) they will likely suffer imminent, irreparable harm, (3) the balance of equities favors an injunction, and (4) the injunction

will serve the public interest. *Id.* at 20. When the government is a party, the public interest is considered at the same time as the equities. *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018). The Ninth Circuit analyzes these factors on a sliding scale. That means a party can meet the first two *Winter* factors by raising serious question about a case "and a hardship balance that tips sharply toward the plaintiff." *All. For the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). But the other *Winter* factors remain mandatory. A preliminary injunction must not issue until the movant demonstrates that irreparable harm is likely and imminent, not merely possible and speculative. *Id*. at 1131. As explained below, Northern Center's motion is **DENIED** because it fails to satisfy the *Winter* factors.

### 1. Northern Center is not likely to succeed on the merits.

Northern Center argues that its case will likely succeed on the merits for one reason: ANCSA § 17(c) prohibits Interior from treating the State's land selections in the Dalton Highway Corridor as effective selections. (Dkt. 17 at 9-14) Section 17(c) provides:

> In the event that the Secretary withdraws a utility and transportation corridor across public lands in Alaska pursuant to his existing authority, the State, the Village Corporations and the Regional Corporations shall not be permitted to select lands from the area withdrawn.

43 U.S.C. § 1616(c). According to Northern Center, this law is a one-way ratchet. (Dkt. 17 at 11-14) Because Interior withdrew lands subject to Section 17(c), Alaska cannot obtain effective selections for those lands without further Congressional authorization. Under this reading, it is not enough for Interior to revoke the withdrawal.[6] So even assuming that the

---

[6] The Parties appear to agree that Interior has general authority to revoke a withdrawal. (*See* Dkt. 30 at 3 (agreeing to "assum[e] the Secretary could lawfully revoke the withdrawal")). Northern Center briefly argues that "any inherent reconsideration authority

revocation of PLO 5150 was valid, the prohibition in 17(c) would still bar Alaska's topfilings from becoming effective selections.

This argument is not persuasive. Start with ANCSA § 17(c). That provision barred Alaska from selecting lands "from the area withdrawn." 43 U.S.C. § 1616(c). Northern Center reads this bar as permanent. But that is not what the statute says. The prohibition turns on the land's status as part of "the area withdrawn." Thus, looking at Section 17(c), Alaska was initially barred from choosing lands in the Dalton Highway Corridor *while* they were withdrawn. It does not transform the Secretary's withdrawal into an irreversible act of statutory consecration. Congress knows how to impose permanent restrictions on land selection and conveyance. It did not do that in Section 17(c).

In any event, things changed with ANILCA § 906(e) and § 906(j)(1). Section 906(e) authorized Alaska to submit topfilings for unavailable federal land that might become available. As Congress explained, "[e]ach such application, if otherwise valid, shall become an effective selection without further action by the State upon the date the lands included in such application become available." 43 U.S.C. § 1635(e). And Section 906(j)(1) guaranteed that this process is available for lands covered by PLO 5150: "[T]o the extent that Public Land Orders Numbered 5150 . . . continue to prohibit State selections of certain lands, such lands shall remain unavailable for future State selection except as provided by subsection (e) of this Act." 43 U.S.C. § 1635(j)(1). It is difficult to imagine a

_____

does not apply in cases where Congress has spoken." *Ivy Sports Med. LLC v. Burdwell*, 767 F.3d 81, 86 (D.C. Cir. 2014). But Section 17(c) clearly does not limit Interior's general authority to revoke a withdrawal. At best, it imposes consequences that endure beyond the revocation of a withdrawal. That argument is dealt with above.

more complete departure from the initial view of Section 17(c). Before ANILCA, Alaska was "not be permitted to select lands" withdrawn subject to Section 17(c). After ANILCA, some of those very lands became available for selection "as provided by subsection (e)."

Northern Center's framing in its reply brief confirms, not undermines, this reading. There, Northern Center argues that ANILCA and Section 17(c) must be harmonized. (Dkt. 30 at 5) But that cuts against Northern Center, because it is the Defendants' reading that gives both provisions full effect. Section 17(c) bars selections from becoming effective while the land is withdrawn, but Section 906(e) and § 906(j)(1) allow topfilings (i.e., future selection applications) and supply the mechanism by which topfilings become effective selections. This approach harmonizes the statutes and, crucially, gives each section meaning.[7] But under Northern Center's reading, where Section 17(c) permanently overrides Section 906(e), the Section 906(j)(1) language "except as provided by subsection (e)" is rendered meaningless.

Northern Center's textual argument does not alter this conclusion. It emphasizes that a topfiling only becomes an effective selection if it is "otherwise valid." 43 U.S.C. § 1635(e). According to Northern Center, Alaska's topfilings in the Dalton Highway Corridor were never "otherwise valid" because Section 17(c) prohibited the State from selecting lands within the withdrawal corridor.

---

[7] The presumption against implied repeal favors giving effect to both statutes, which is what the reading adopted here does. But even if the provisions could not be reconciled, the later and more specific one (here, ANILCA) would control. *See United States v. Est. of Romani*, 523 U.S. 517, 532 (1998).

The difficulty with that argument is that Congress addressed this precise circumstance in ANILCA. Section 906(j)(1) specifically governs certain lands subject to Section 17(c) and directs that those lands be selected "as provided by subsection (e)." 43 U.S.C. § 1635(j)(1). In other words, Congress did not treat Section 17(c) lands as categorically incapable of becoming effective selections. It *expressly* directed that they proceed through ANILCA's topfiling mechanism.

Northern Center's reading would largely deprive that language of any practical effect. If Section 17(c) rendered every qualifying topfiling permanently invalid, Congress's express reference to subsection (e) would accomplish little, if anything. And it would make little sense for Congress to expressly authorize topfilings that would be categorically barred from becoming effective selections. Statutes should not be construed in a manner that renders their operative language superfluous. *See Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 166-167 (2004).

Section 906 is the better guide to what Congress meant by "otherwise valid." It imposes familiar conditions on a valid topfiling, including a proper application, no conflicting prior selections, and the lands cannot be within a conservation system unit. *See, e.g.*, 43 U.S.C. § 1635(e) (requiring "selection application[]", making it "subject to existing rights," and excluding "lands withing any conservation system unit"). The statute does not incorporate an indefinite prohibition preventing topfilings in the Dalton Highway Corridor from ripening into effective selections once the withdrawal is revoked.

Accordingly, Northern Center has not demonstrated that it is likely to succeed on the merits of its ANCSA § 17(c) claim. This conclusion follows the statutory text. ANILCA

§ 906(j)(1) and § 906(e) establish the mechanism by which Alaska's topfilings in the Dalton Highway Corridor ripen into effective selections once the lands became available. At this preliminary stage, that text forecloses Northern Center's contrary interpretation.

### 2. Northern Center has not shown that irreparable harm is imminent.

Northern Center must show that irreparable harm is likely before a decision on the merits can be rendered. *Winter*, 555 U.S. at 22. Speculative injury is not enough. *Winter*, 555 U.S. at 22. The injury must be actual and imminent, not conjectural or hypothetical. *Caribbean Marine Services Co. v. Baldrige*, 844 F.2d 668, 674-75 (9th Cir. 1988); *see Los Angeles v. Lyons*, 461 U.S. 95, 109, 111. And a preliminary injunction is designed to preserve the relative positions of the parties until the merits can be resolved, not to guard against every possible future development. *See University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).

Northern Center advances two principal irreparable-harm theories. First, it argues that if the transfer process proceeds, the Court may be unable to grant relief, particularly in light of Alaska's sovereign immunity arguments. (Dkt. 17 at 3-4, 15-16) Second, it argues that continued progress toward conveyance will cause environmental, subsistence, access, recreational, and member-specific harms. (Dkt. 17 at 15-19) Neither theory establishes that irreparable harm is likely before the merits can be resolved.

Northern Center first argues that an injunction is necessary to preserve the Court's ability to provide effective relief. (Dkt. 17 at 15-16) That argument has some intuitive force. As explained above, federal courts lack jurisdiction to unwind tentative approvals. But that alone does not prove that harm is imminent.

Interior, the party responsible for tentative approvals, submitted a declaration stating that "it would typically take several months at a minimum to [tentatively approve] or patent any additional land within the lands affected by PLO 7966" and that "none of these processes will start until, and unless the State requests a conveyance." (Dkt. 25-1 at 2-3) In other words, Northern Center seeks to enjoin an event that is neither imminent nor inevitable. Any additional tentative approval is, by Interior's own declaration, both months away and contingent on a new request from Alaska. That is insufficient to justify the extraordinary remedy of a preliminary injunction.

Northern Center's framing of its own motion confirms the point. It filed the motion "out of an abundance of caution." (Dkt. 17 at 3) But that approach is incompatible with *Winter*. 555 U.S. at 22. If a plaintiff could obtain preliminary relief out of an abundance of caution, preliminary injunctions would become routine rather than extraordinary. That is not the law.

Northern Center next argues that preliminary relief is necessary to prevent environmental, subsistence, and access harms. (Dkt. 17 at 15-19) They contend that once Alaska acquires title to lands, federal protections no longer apply. That could allow activities such as mining and economic development to occur, federal subsistence protections under ANILCA to be lost, and federal access guarantees to be diminished. (Dkt. 17 at 15-16) This argument relies on authority recognizing that environmental injury may be irreparable and that loss of public lands or federal protections can support injunctive relief in appropriate circumstances. *See Env. Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 991-92 (9th Cir. 2020); *Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1176-78

(9th Cir. 2000); *All. for the Wild Rockies*, 632 F.3d at 1135; *Nat. Wildlife Fed. v. Burford*, 835 F.2d 305, 325-27 (D.C. Cir. 1987).

Those cases establish important principles. Environmental injury can be irreparable. But *Winter* still requires a showing that those injuries are likely and imminent. A general concern that title will be transferred and future State management may allow different uses, different access rules, different wildlife management, or future industrial development is too speculative to justify preliminary relief. Indeed, Northern Center focuses on the mere possibility of changes to mining, mineral leasing, industrial development, "sport hunting," and access.[8] (Dkt. 17 at 15–19) But they have not shown that those uses are likely to occur on the non-tentatively-approved lands before a merits decision can be rendered. Or that tentative approval of additional lands is imminent.

The same is true of subsistence and access arguments. Northern Center cites *United States v. Alaska*, 608 F. Supp. 3d 802 (D. Alaska 2022) and *United States v. Alaska*, 151 F.4th 1124 (9th Cir. 2025), to emphasize the importance of ANILCA's federal subsistence protections. (Dkt. 17 at 16) Those protections are important. But those decisions addressed the Federal Subsistence Board's regulatory authority over navigable waterways after title to the underlying lands had already vested in the State. *See Alaska*, 151 F.4th at 1134-35. They did not hold that every future conveyance of federal land constitutes irreparable harm requiring preliminary injunctive relief.

---

[8] Alaska points out that several uses that Northern Center is worried about are already protected or preserved as valid existing rights, including federal mining claims, federal rights-of-way, federal permits, and the Ambler Industrial Road right-of-way. (Dkt. 23 at 10).

Northern Center's argument proves too much. Taken to its logical conclusion, every Congressionally authorized transfer of federal land into State ownership would itself constitute irreparable harm requiring an injunction until the transfer could be litigated to completion. Neither the cases cited nor *Winter* supports such a rule. Congress plainly contemplated that federal lands would continue to pass into State ownership. ANILCA itself established the mechanism by which that process occurs. The mere prospect that additional lands may eventually transfer under that statutory framework does not, without more, establish irreparable harm.

### IV.   CONCLUSION

Alaska's motion to dismiss is **GRANTED** in part. Northern Center's motion for a preliminary injunction is **DENIED**.

IT IS SO ORDERED.

DATED July 24, 2026, at Anchorage, Alaska.

/s/ *Aaron Christian Peterson*
Aaron Christian Peterson
United States District Judge